## MARKEY v. HIBERNIA HOMESTEAD ASS'N et al.*

### No. 17064.

Court of Appeal of Louisiana. Orleans.

Feb. 27, 1939.

*Rehearing denied March 27, 1939.

758

A. G. Williams, of New Orleans, for appellant.

Rene A. Viosca and Pat W. Browne, both of New Orleans, for appellees.

McCALEB, Judge.

Plaintiff, Mrs. John T. Knoop, instituted this suit against the Hibernia Homestead Association and three members of its Board of Directors, namely, Sidney Freudenstein, Gilbert O. Bergeron and George H. Maginnis, who constituted a Board of Directors Committee for the purchase of shares of the homestead stock, to recover the damages she claims to have sustained as the result of a scheme allegedly concocted by the defendants by which she charges that she was fraudulently induced to sell to the homestead 17 shares of its capital stock (par value $100 per share) for $50 per share.

The defendants filed exceptions of no right or cause of action to her petition which were sustained in the court below. From the judgment dismissing her suit on these exceptions, the plaintiff has appealed.

Prior to April 22, 1936, plaintiff was the holder and owner of 17 shares of the capital stock of the defendant homestead of a par value of $100 per share. On that date she sold her stock to it for 50% of the par value. She now seeks to hold the association and three of its directors in damages, claiming that she was induced to dispose of the stock as a consequence of their fraudulent representations and concealment.

The facts upon which she bases her charges of fraud are set forth by her at great length in an original and a supplemental petition to which she attached 35 exhibits. It would serve no useful purpose to discuss in detail all of the circumstances from which she draws the conclusion that the defendants have deceived her and it will suffice if her complaints are analyzed in connection with certain circular letters and other correspondence had between her and the homestead which led up to the sale and purchase of her stock and upon which her charges of bad faith on defendants' part are predicated. The letters, which reveal the pertinent negotiations between the parties, are as follows:

"Hibernia Homestead Association
"636 Commercial Place
"New Orleans, La.,
"March 12th, 1936.

"To our Members:

"Effective at once this association will pay in cash fifty dollars per share for its stock—par value $100.00.

"All transactions are handled in our office and can be completed at once, but only the person in whose name the stock is issued can be dealt with.

"This offer is made possible by a recent ruling modifying the conditions governing the purchase by a homestead of its shares and is subject to withdrawal without notice if future rulings make this necessary. It is also subject to withdrawal or modification by action of your Board of Directors if and when in their judgment such withdrawal or change of price is for the best interest of the Association.

"If you care to dispose of your stock at this figure it is advisable to call at our office at once as it is impossible for us to

set any time limit on this offer for the reasons given above.

"Very truly yours,
"Frank B. Sullivan, President
"James T. Dwyer, Sect-Treas."

"Hibernia Homestead Association
"636 Commercial Place
"New Orleans, La.,
"April 2nd, 1936.

"To our Members:

"The undersigned Committee created and its duties defined by resolution of the Board of Directors adopted at its regular meeting of Friday, March 27th, 1936, begs to advise:

"Your Board of Directors Committee has decided to reduce to thirty-five dollars the price the Association will pay for shares of its stock—par value $100.00.

"This new price will become effective April 22, 1936, until which date we shall continue to pay fifty dollars a share.

"As you know our net assets are less than the amount of our outstanding shares. The shortage or deficit has increased in the last three months from $16,652.63 to $42,918.95. This was brought about through losses sustained in the sales of our repossessed property. Most of our unsold real estate is either commercial or unimproved and because there is very little demand for this type of property at this time, further losses must be sustained in disposing of it.

"For these reasons it was felt that it is not to the best interest of the Association to continue the present offer of $50.00 a share indefinitely.

"In order that those share holders who were unable to call at the office may not lose their opportunity to sell their stock at fifty dollars a share if they care to do so, that offer is held open until April 22, 1936, but it will positively not continue after that date.

"Very truly yours,
"Board of Directors Committee
"Sidney Freudenstein, Chairman,
"G. O. Bergeron, Vice-Chairman
"George H. Maginnis."
"New Orleans, Louisiana
"April 8th, 1936

"Hibernia Homestead Assn.
"636 Commercial Place
"New Orleans, La.
"Gentlemen:

"As a large stockholder of your Association I was very much surprised to read your letter of April 2nd, 1936 showing that for the first three months of this year your deficit increased from $16,652.63 to $42,918.95 and that on and after April 22nd, 1936 you will cease paying fifty dollars ($50.00) a share and pay only thirty-five dollars ($35.00) a share of one hundred dollars ($100.00). I hardly can reconcile your letter with the semi-annual statement sent me February 6th, 1936. I would like to have the following questions answered:

"Did you ever apply for U. S. Government Insurance?

"When and to whom was the application made?

"Why was it turned down and by whom?

"What are the present monthly operating expenses, giving each name and salary.

"Please answer as soon as possible and oblige.

"Thank you in advance.
"Mrs. Claudia Knoop
"2626 Cleveland Ave."

"Hibernia Homestead Association
"636 Commercial Place
"New Orleans, La.,
"April 14th, 1936.

"Mrs. Claudia Knoop,
"2626 Cleveland Ave.,
"New Orleans, La.
"Dear Madam:

"Replying to your letter of the eighth: If you will read our circular of April second carefully, you will see that it says that this increase in the deficit was brought about through losses sustained in the sales of our repossessed property. We give you below a statement of the Real Estate account for the last three months showing the amount of these losses.

"Real Estate on hand Jan. 1,
1936 .......................... $106,766.97
Repossessed since ............. 7,362.50
Repairs, Commissions, etc..... 671.95 $114,801.42
Real Estate on hand March 31, 1936...... 63,877.26

Cost of Real Estate sold................. 50,924.16
Total Sales of Real Estate January-March ................................ 24,525.00

Loss on these transactions............... $ 26,399.16

"You will notice that this is slightly more than the increase in the deficit, showing that our income has taken care of all expenses and all losses in making compromise settlement of doubtful accounts.

"In common with all other Homesteads we submitted our application for insurance

of shares to the Federal Savings and Loan Insurance Corporation in November of 1934. This application was refused on August 16 1935, through the Federal Home Loan Bank of Little Rock, Arkansas, in a letter from the President, Mr. B. H. Wooten. While no reason was given, it was because our slow assets, that is real estate and accounts in arrears, formed too great a proportion of our total worth. This reason no longer exists, but the liquidation of the real estate has resulted in losses which entirely consumed our reserve and created a deficit. As stated in the circular, this deficit will be further increased in the sale of the remaining property.

"Our average monthly expenses for the last six months is $680.32. This is made up of the following:

| | |
|---|---|
| Salaries—Secretary-Treasurer | $300.00 |
| Bookkeeper | 120.00 |
| Stenographer | 65.00 |
| Attorney | 25.00 |
| Auditor and Bank Examiner | 25.83 |
| Rent | 50.00 |
| Insurance and Bonds | 15.19 |
| Miscellaneous | 79.30 |
| | $680.32 |

"The writer has had many conversations with Mr. Knoop about the affairs of the Homestead and will be glad to discuss them with you or with him or any one whom you send at any time.

"Very truly yours,
"Hibernia Homestead Association
"James T. Dwyer, Sect-Treas."

"Hibernia Homestead Association
"636 Commercial Place,
"New Orleans, La.
"April 15th, 1936.

"To our Members:

"Supplementing our letter of April 2, 1936, in order that all members may have fair notice and as a reminder we beg to advise you that:—

"Hibernia Homestead Association will pay fifty dollars a share—par value $100.00 for Full Paid and Current Stock up to and including Wednesday April 22nd and thereafter the price will be thirty-five dollars per share.

"Respectfully,
"Board of Directors Committee
"Sidney A. Freudenstein, Chairman
"G. O. Bergeron, Vice-Chairman
"George H. Maginnis."

"New Orleans, Louisiana
"April 15, 1936
"Hibernia Homestead Assn.
"636 Commercial Place,
"New Orleans, Louisiana.
"Gentlemen:

"Your favor of 14th inst. received yesterday and thank you for same. The present monthly operating expenses of $680.32 seems reasonable enough.

"But the amount of real estate, $63,887.26 on hand of date March 31st, 1936, which you say when sold will further increase your present deficit of $42,918.95 after having previously exhausted your reserve, makes it doubtful in my mind whether or not it is the best interest of all stockholders to further prolong the agency by continuing operation at a daily loss. Now as men of large business experience, I want you to timely and fully advise me what to do. What will be the advantage?

"Awaiting your early reply, I thank you in advance.

"Yours very truly,
"Mrs. Claudia Knoop."

"Hibernia Homestead Association
"636 Commercial Place
"New Orleans, La.,
"April 17th, 1936.

"Mrs. Claudia Knoop,
"2626 Cleveland Ave.,
"New Orleans, La.
"Dear Madam:

"Replying to your letter of the 15th inst. If you will call at our office we shall be glad to discuss this matter with you fully. It would be almost impossible to do this by mail. If you care to bring your Attorney or a friend with you, we shall be glad to have you do so.

"Very truly yours,
"Hibernia Homestead Association
"James T. Dwyer, Sect-Treas."

"New Orleans, Louisiana
"April 20th, 1936.
"Hibernia Homestead Assn.
"636 Commercial Place,
"New Orleans, Louisiana.
"Gentlemen:

"Your favor of 17th inst. is at hand. The question asked of you in my letter of the 15th inst. is simply this:

"In your opinion as our trusted officers of this Association whether or not, in the face of the figures showing continued losses, it would in your opinion and matur-

ed judgment be to the best interest of all stockholders to continue present operation. The simple answer would be, yes or no. Please answer at once, and I thank you in advance.

"Yours very truly,
"Mrs. Claudia Knoop
"2626 Cleveland Ave."

"Hibernia Homestead Association
"636 Commercial Place
"New Orleans, La.
"April 20th, 1936.

"Mrs. Claudia Knoop
"2626 Cleveland Ave.
"New Orleans, La.

"Dear Madam:

"Replying to your letter of April 20th, the position of our Association is that it is for the best interest of our members to continue operations rather than resort to liquidation, which is at all times expensive. In our opinion liquidation through process of court would not yield the fifty percent the Association is offering up to and including Wednesday, April 22, 1936, for shares of stock.

"Very truly yours,
"Hibernia Homestead Association
"James T. Dwyer, Sect-Treas."

Plaintiff alleges that the communications from the homestead to its members were sent out by the defendant directors in conformity with a scheme devised by them, whereby they planned to liquidate the homestead's indebtedness to plaintiff (and many stockholders similarly situated) for fifty cents on the dollar and thereby increase the value of their own stock and that of their friends. She further charges that the defendant directors knew, at the time they made the offer contained in the circular letters of the homestead to the stockholders, that the stock had a market value far in excess of 50% of its par value; that it was their intention that the plaintiff (and others) should believe that, unless she disposed of her stock for 50% of its par value, the association would be forced into liquidation and that she would not get anything like the price tendered by them in a judicial settlement of the affairs of the concern; that it was the defendants' purpose to profit by the sacrifices made by plaintiff and others in the sale of the stock in that the defendant directors and their friends had no intention of ever disposing of their stock at such a low price; that

the defendants further, in their later pretentions that they would only pay $35 per share for outstanding stock, caused her to believe that she would suffer a greater loss in the event she failed to take advantage of the initial offer made by them on or before April 22, 1936, when, in truth, they never had any intention of paying less than $50 per share for the stock and that the representations made in the communications addressed to her were conceived with the specific design of preferring themselves and other stockholders (who were their friends) over the plaintiff and others similarly situated.

The defendants contend that the allegations of plaintiff's petition concerning the alleged fraud practiced by them upon her are mere conclusions of law and that the correspondence exchanged between plaintiff and the homestead plainly discloses that they were acting in good faith at all times and were doing all within their power to protect the association from a judicial liquidation which would have redounded to the detriment of all of the stockholders. They further assert that the correspondence also reveals that plaintiff was not induced to part with her stock but that, on the contrary, plaintiff's letters to the homestead exhibit that she was fully advised as to its financial condition and that she sold her stock because she felt, after due deliberation, that it would be better to accept 50% of its par value than to take the chance of sustaining a greater loss in the event the company was forced into judicial liquidation.

In resolving whether the exceptions of the defendants are well founded, it is apt to review briefly the financial difficulties of the association existing prior to the time the offers to purchase the stock were mailed out. The homesteads of New Orleans, like most of the building and loan associations throughout this country, were in desperate straits following the economic depression which began in 1929. Their assets (invested in vendor's lien mortgages on real estate) became frozen as the result of their debtors' inability to pay the instalments falling due on the mortgages. As a consequence, the building and loan associations were compelled, in most instances, to foreclose upon the real estate which secured the payment of the notes and invariably they were forced to bid in the property at the sheriff's sale in satisfac-

tion of the debt. After they acquired the property, they had but slight hope of disposing of it, since the real estate market was stagnant during that period.

On June 27, 1934, the Congress of the United States, being advised of the fact that a large number of homesteads (in which the savings of many people had been invested) would be forced into judicial liquidation, created the Federal Savings & Loan Insurance Corporation for the purpose of lending the government's financial aid to any homestead which was actually or potentially solvent. That corporation was empowered to insure the accounts of homestead associations organized and operated under the laws of any state, district or territory of the United States. See U. S.C.A., Title 12, Sections 1724 through 1732.

As soon as the Federal Savings & Loan Insurance Corporation was created, the defendant homestead, as well as other building and loan associations operating within New Orleans and vicinity, submitted its application to that body wherein it sought the grant of insurance upon its shares. On August 16, 1935, its request was denied by the federal corporation. After the refusal of its application, the directors of the defendant homestead, realizing that the association could not continue in business indefinitely without its shares insured, devised a plan whereby the company could reduce its liabilities to its stockholders to such an extent that the assets within its possession would be sufficient to take care of its obligations. That plan was to liquidate a considerable portion of its obligation to its stockholders by purchasing a large number of shares of the paid up stock issued by it for fifty cents on the dollar. The proposal was submitted to and approved by the State Bank Commissioner of Louisiana and, in accordance therewith, the letters which form the basis of plaintiff's complaint were sent out to the association's stockholders.

Plaintiff concedes that the State Bank Commissioner, acting within the broad powers conferred upon him by law (Act No. 140 of 1932), had the right to authorize the defendant homestead to carry its plan into effect. However, her complaint is premised upon the contention that it was the duty of the defendant directors to fully advise her and other stockholders of the association of their plan and her counsel argues that the communications addressed to her, instead of enlightening her upon that subject, were couched in language calculated to conceal from her the true intent and purpose underlying the proposal.

Preliminarily, we observe that the Board of Directors of the defendant homestead could not have intended (in the offer dated March 12, 1936, to purchase the outstanding stock of the corporation for fifty cents on the dollar) that all of the shareholders would avail themselves of the opportunity to dispose of their stock at that amount for, if such was the case, the liabilities of the corporation to its stockholders would have been entirely liquidated. Hence, it is safe to conclude that the directors either had no intention of selling all or any portion of their own holdings at the price submitted or that they knew that certain stockholders would not do so. It is also obvious that the underlying purpose of the homestead's offer was to liquidate a large portion of its liabilities in order that the corporation might obtain insurance (for the shares not purchased by it) with the Federal Savings & Loan Insurance Corporation. Plaintiff alleges that it was the intention of the defendant directors to hold on to their own stock so that the sacrifice sales made by her and other stockholders would increase the ultimate value of their stock and that, as a matter of fact, the scheme devised by them was successful. This allegation is not a conclusion of law but a charge of fact and if it be true that the defendants deliberately concealed the existing facts for the purpose of capturing plaintiff's stock, then she is entitled to the damage she suffered as a result of this practice.

There are a number of significant circumstances surrounding the purchase of plaintiff's stock which warrant an inference of intentional concealment of the facts by the defendants. For instance, in plaintiff's letter of April 8, 1936, she asked the question: "Did you ever apply for U. S. Government Insurance?" When the homestead responded to this query on April 14, 1936, it stated:

"In common with all other Homesteads we submitted our application for insurance of shares to the Federal Savings & Loan Insurance Corporation in November, 1934. This application was refused on August 16, 1935, through the Federal Home Loan Bank of Little Rock, Arkansas, in a letter from the President, Mr. B. H. Wooten.

While no reason was given, it was because our slow assets, that is real estate and accounts in arrears, formed too great a proportion of our total worth. This reason no longer exists, but the liquidation of the real estate has resulted in losses which entirely consumed our reserve and created a deficit."

Nowhere in this letter, or in any subsequent communication of the defendants, is the plaintiff advised of the fact that the homestead intended to submit another application for the insurance of its shares after it had succeeded in reducing its liabilities to its stockholders by acquiring its own stock at fifty cents on the dollar. We cannot fathom why the directors should have failed to inform plaintiff of their intention to renew their application for insurance, unless they felt that a full disclosure by them would have the effect of defeating their ultimate purpose of liquidating a large part of the homestead's liabilities at fifty cents on the dollar. And whether this purpose was conceived in bad faith so that the defendants would gain at plaintiff's expense, can be answered only after a trial of the case on its merits.

█ Another significant point in the chain of circumstances set forth in plaintiff's petition is to be found in the homestead's letters of April 2nd and 15th, 1936, wherein it stated, in effect, that unless the shareholders take advantage of its offer to purchase their stock for fifty cents on the dollar on or .before April 22, 1936, the price would be reduced to $35 per share. Why should the stockholders availing themselves of the offer before April 22nd be given preference over others similarly situated who were not able to decide whether it would be desirable to dispose of their shares? Plaintiff alleges that the defendants never intended to reduce the price of the stock but that, on the contrary, they published the withdrawal of the fifty per cent offer for the purpose of leading many of the shareholders (who had not been persuaded to sacrifice their stock at that price) to believe that, if they did not act immediately, they would suffer a much greater loss. She further sets forth that, as a matter of fact, the homestead did not reduce the price from $50 to $35 after April 22, 1936, and that the communications were sent out in bad faith and with the specific intent of obtaining for the defendants and their friends an increase in the value of their holdings at plaintiff's

expense. These averments are not conclusions of law, as contended for by the defendants, but are deductions of fact which are neither improbable nor fantastic.

Counsel for the defendants argue that the defendants were under no duty to advise plaintiff of the surrounding facts and circumstances when they offered to purchase her stock. They cite in support of the contention Section 36 of Act No. 250 of 1928, 7 Ruling Case Law Sec. 443, 24 Ruling Case Law Section 578, 26 Corpus Juris 1087, and many cases wherein it has been held that ordinarily there is no relation of trust or confidence between a director of a corporation and one of its stockholders. But the cited authorities are, in our opinion, inapplicable to the situation presented in the case at bar.

█ It is generally held that, while a fiduciary relationship in a strict sense does not exist as between the stockholder of a corporation and an officer or director thereof, there is at least a quasi fiduciary connection between the parties, particularly where it is the duty of the director, by reason of special circumstances, to disclose matters within his knowledge. In 13 American Jurisprudence, Section 1011, it is stated:

"A director or officer of a corporation actively engaged in the management of its affairs is, of course, in duty bound not actually to misrepresent the financial or other status of the corporate affairs. And if he does so, it has been held in various cases that the stockholder may rescind the sale or recover damages. *A sound and equitable rule has been taken that while a director or officer may not be a strict fiduciary for an individual stockholder from whom he purchases stock, yet if called upon for information concerning the affairs of the company or if he volunteers such information or becomes active in inducing the sale, he must speak fully and frankly and conceal nothing to the disadvantage of the selling stockholder.* Relief will be granted also to the stockholder where the purchasing director conspires to reduce the market price of the stock." (Italics ours)

See, also, Fletcher's Cyclopedia of the Law of Corporations, vol. 3, sections 838 and 848.

█ We also take cognizance that, in the instant case, we are dealing with the rights of a stockholder in a building and loan association which is a mutual organi·

zation impressed with a public trust. In 12 Corpus Juris Secundum, Building and Loan Associations, § 3, page 396, the nature and status of a building and loan association is set forth as follows:

"Building and loan associations are mutual organizations of a public character, lending money for the building of homes. When incorporated they are private corporations of a peculiar nature, partaking somewhat of the nature of a limited partnership. When unincorporated they are partnerships."

It is to be observed here that the defendant directors were not purchasing plaintiff's stock with their own funds. On the contrary, they were using the assets of the corporation for that purpose. It seems too plain for extended argument that, under such circumstances, they became trustees for all of the stockholders and that, if they concealed in bad faith any facts from any one of the persons affected by the plan they devised, they should be made to respond for their deceit.

In Wood v. MacLean Drug Co., 266 Ill. App. 5, it was held that a purchase of a block of its common stock by a family-owned chain drug corporation is subject to rescission, in a suit by a stockholder from whom purchased, after a sale of the company's stores to another company for an amount much larger per share of common stock than that paid to the individual stockholder, where it was not disclosed to such stockholder at the time of the purchase from her that two of the directors of her company, who were president and vice-president respectively, were negotiating with other companies for the sale of the company's stores, and such fact did not appear of record. There, the court, in distinguishing between the relation of a director who is purchasing the corporate stock for his own account from an individual stockholder, and the fiduciary capacity in which he acts where he is endeavoring to purchase stock for the corporation itself, stated:

"In the instant case, when the board of directors of the MacLean Drug Company, acting as such board, bought Mrs. Wood's stock, *not for the individual directors personally but for the MacLean Drug Company, a corporation, they were acting in their official capacities as directors,* and under the law as stated in the Hooker case, (See 215 Ill. 444 [74 N.E. 445, 106 Am.St. Rep. 170]) we think they were acting as trustees for Mrs. Wood and were in duty bound to advise her of all the facts; not having done so, she is entitled to recover the balance of the value of her 500 shares." (Italics and words in parenthesis ours)

The defendants also maintain that the conclusions drawn by plaintiff, with respect to the fraud which was allegedly perpetrated by them, are unwarranted because the correspondence which forms the basis of plaintiff's claim does not show that they misrepresented the facts. But fraud and deceit need not necessarily be founded upon misrepresentation. On the contrary, a failure to state facts, where there is a duty to fully disclose them, is equally wrongful. If it be so that the defendant in this case intended that plaintiff should not know that federal insurance of the homestead stock might be obtained if the liabilities of the association were reduced through the purchase of its own shares at prices under par, failure to disclose those facts is just as effective in law as it would have been in case they had actively misrepresented the truth. Rev. Civ.Code, arts. 1832, 1847.

Counsel for the defendants moreover contend that plaintiff was not defrauded, since the letters she wrote to the homestead reveal that she did not dispose of her stock until after she had fully discussed the homestead's condition with her family and friends and was convinced that it was the safest course to pursue. We do not think that her pleadings warrant such a conclusion. It is true that she voiced the opinion that the homestead should discontinue its operations and liquidate its affairs but it would be improbable to believe that she would have sponsored such a course if the defendants had advised her that there was a possibility that the homestead shares would be insured by the Federal Savings & Loan Insurance Corporation in the event its liability to its stockholders was diminished.

A careful analysis of plaintiff's petition and the exhibits attached thereto justifies the conclusion that she states a case of actionable fraud. The defendants' exceptions of no right or cause of action were therefore improperly sustained. We note, however, that other exceptions were filed by the defendants which our brother below evidently did not consider in view of his belief that no cause of action was

stated. We reserve to them the right of urging those exceptions when the case is remanded.

For the reasons assigned, the judgment appealed from is reversed and it is now ordered that this cause be remanded to the Civil District Court for the Parish of Orleans for further proceedings according to law and consistent with the views herein expressed. Defendants to pay the cost of this appeal.

Reversed and remanded.