Plaintiff, Mrs. John T. Knoop, instituted this suit against the Hibernia Homestead Association and three members of its Board of Directors, namely — Sidney Freudenstein, Gilbert Q. Bergeron and George H. Maginnis, who constituted a Board of Directors Committee, to recover damages which she has allegedly sustained as the result of a scheme concocted by the defendants by which she was fraudulently induced to sell to the homestead 17 shares of its capital stock (par value $100 per share) for $50 per share. The facts upon which plaintiff bases her cause of action are set forth at great length by her in an original and supplemental petition to which are attached 35 exhibits. The substance of her complaint is as follows:
That, prior to April 22, 1936, she was the holder and owner of 17 shares of the capital stock of the defendant homestead of a par value of $100 per share. On that date, she sold her stock to the homestead for 50 per cent. of its par value. She alleges that this sale was consummated as the result of misrepresentation, fraud and duress practiced upon her by the directors of the defendant corporation, and particularly the individual defendants, who composed a committee which was organized for the purpose of purchasing shares of the homestead stock at reduced prices; that the members of this Committee devised a scheme by which they sought, through misrepresentation and duress, to induce the shareholders of the homestead to sell their stock at such reduced prices for the specific purpose of increasing the value of the stock held by the directors of the homestead, their families and friends, who, it is alleged, had no intention of parting with their stock but sought to reap the benefit of the redemption of plaintiff's stock at reduced prices and thereby improve the financial position of the homestead so that it would be possible for said homestead to have its shares insured by the Federal Savings and Loan Insurance Corporation and that, as a result of the misleading communications which were sent out by the Committee in furtherance of its plan, defendants succeeded in inducing plaintiff and others to sell their stock and thus enrich themselves and the corporation at their expense.
In support of her charges, plaintiff attached to her petition a number of letters mailed by the homestead to her dating from March 12, 1936 to and including April 20, 1936, and also several letters which she wrote to the homestead in which she made inquiry concerning the financial condition of the company.
To this petition, the defendants interposed a number of exceptions including an exception of no right or cause of action. The latter exception was predicated on the theory that the plaintiff's averments, with respect to the alleged fraud practiced upon her, were mere conclusions of law and that the correspondence exchanged between plaintiff and the homestead revealed that they, the defendants, were acting in good faith at all times and were doing all within their power to protect the association from judicial liquidation which would have redounded to the deteriment of all of the stockholders. This exception was sustained by the District Court and plaintiff's suit was dismissed. On appeal to this court, the judgment of the lower court was reversed and the case remanded for further proceedings. See La.App., 186 So. 757. Reference is made to that decision for the law of the case. There, we undertook to review in detail the correspondence which passed between plaintiff and the homestead, in which the directors and the members of the Board of Directors Committee sent out notices to the stockholders of the association offering to purchase their shares for 50¢ on the dollar. After setting forth this correspondence and considering it in connection with the allegations of plaintiff's petition, wherein she charged, in substance, that the defendants had devised a scheme to defraud her and other stockholders similarly situated by inducing them to part with their stock at reduced prices with the evil intent of holding on to their own stock and advising their friends to do likewise so that they and their friends could obtain federal insurance *Page 793 
for their shares at the expense of plaintiff and the other stockholders, we concluded that the allegations were sufficient to state a case of actionable fraud entitling plaintiff to redress in the event she could establish them by adequate proof.
When the case was remanded to the lower court for proceedings consistent with the views expressed in our opinion, the defendants answered and denied all of the charges and inferences drawn by plaintiff in her pleadings with respect to fraud, misrepresentation and duress. They set forth, in substance, that the defendant homestead had its financial condition seriously impaired by the depression which occurred during the year 1929 and, in common with the other homesteads operating in the city of New Orleans, it sought to take advantage of remedial legislation, which had been passed by Congress for the relief of building and loan associations whose assets had been frozen, by making application to the Federal Savings and Loan Insurance Corporation to have its shares insured; that its application was rejected on August 16, 1935 because its slow assets (that is, its real estate and accounts in arrears) formed too great a proportion of its total worth; that, after the rejection of its application by the Federal Savings and Loan Insurance Corporation, it endeavored to reduce its liabilities to its stockholders by purchasing their stock at reduced prices so that, in the event enough stock was repurchased, it could renew its application for insurance of its shares; that, in accordance with this plan, it did from time to time purchase the stock at 50¢ on the dollar; that it was a matter of common knowledge, among all of the stockholders of defendant and the other homesteads of New Orleans, that purchases of this type were being made for the purpose of reducing liabilities and in the hope that federal insurance for the homestead could ultimately be obtained; that neither the defendants nor the directors of the homestead sought to profit or enrich themselves at the expense of the stockholders; that the individual defendants, the directors and their families sold more than 50 percent of their stock at reduced prices in order that the homestead might obtain federal insurance; that neither plaintiff nor any other stockholder was deceived with respect to the offers made by the homestead to purchase their shares and that plaintiff sold her stock because she was satisfied that it would be better to receive 50¢ on the dollar than take the risk of judicial liquidation in the event federal insurance was not obtained. Accordingly, defendants prayed that they be hence dismissed with costs.
After a protracted trial on the foregoing issues, there was judgment in favor of the defendants and plaintiff's suit was dismissed. She has appealed from the adverse decision.
The voluminous record in this case (consisting of approximately 700 pages) discloses the following facts:
Following the economic depression which began in 1929, the homesteads of this country were in serious financial difficulties due to the fact that their principal assets, which were invested in vendors' lien mortgages, had been frozen as the result of their debtors' inability to pay installments falling due on the mortgages. As a consequence, these associations were compelled, in most instances, to foreclose on the real estate which secured the payment on the notes and invariably they were forced to bid in the property at sheriff's sale in satisfaction of the debt. After they acquired the property they had but slight hope of disposing of it as the real estate market was stagnant during that period of time.
On June 27, 1934, the Congress of the United States, realizing that something should be done to protect these homesteads in which the savings of many people had been invested, created the Federal Savings and Loan Insurance Corporation for the purpose of lending the Government's financial aid to any homestead which was actually or potentially solvent. That corporation was empowered to insure the accounts of homestead associations organized and operating under the laws of any State, District or Territory of the United States. Likewise, the Legislature of Louisiana came to the assistance of the homesteads of the State by passing legislation to aid them in their efforts to obtain federal insurance for their shares. See Act No. 140 of 1932, Act No. 5 of 1934 and Act No. 44 of the Second Extra Session of 1934, which amended and re-enacted sections 66 and 67 of Act No. 140 of 1932. Under these laws, the homesteads operating in Louisiana were authorized to use the proceeds of the sale of bonds, acquired by them from the *Page 794 
Home Owners' Loan Corporation, to purchase shares of their outstanding stock at reduced prices and, under the broad powers given the State Bank Commissioner by Act No. 140 of 1932, as amended, the Supervisor of Homestead and Building and Loan Associations was given full authority to direct the board of directors of any homestead to take such steps as, in his judgment, he deemed wise and expedient to protect the best interests of all concerned.
The Hibernia Homestead Association, as well as other homesteads domiciled in the city of New Orleans, sought to take advantage of the legislation passed for the relief of homesteads generally and applied for federal insurance during the year 1934. This application was rejected by the Federal Savings and Loan Insurance Corporation on August 16, 1935, on the ground that the slow assets of the homestead, that is, real estate and accounts in arrears, formed too great a proportion of the total worth of the company. The association also took advantage of the legislative acts which permitted it to use the proceeds of the bonds it had acquired from the Home Owners' Loan Corporation to purchase its stock at reduced prices. On October 30, 1934, it mailed a circular letter to its shareholders offering to purchase their stock at $48 per share. On May 3, 1935, it increased the price to $55 per share. On May 17, 1935, the price was reduced to $51 per share and, on July 30, 1935, the price was again reduced to $35 per share where it remained until March 12, 1936. During all of this period, transactions for the sale of the homestead stock were handled through the New Orleans Homestead Clearing House Association. During the early part of 1936, the State Bank Commissioner, acting in pursuance of the power vested in him, made a ruling modifying the conditions governing the purchase by homesteads of their shares. This ruling made it possible for homesteads to purchase directly from the shareholder and without the necessity of having the transactions clear through the New Orleans Homestead Clearing House Association. It was because of this ruling, and also because of the fact that the directors of the homestead had devised a plan to purchase $200,000 worth of its stock, that the Board was prompted to send out a circular letter to its shareholders, dated March 12, 1936, wherein it offered to purchase its shares at 50¢ on the dollar. It appears that, at that time, the Board anticipated a net deficit of $94,000. The only practical way in which this deficit could be wiped out was by reducing the association's liability to its stockholders. Therefore, the Board of Directors devised the idea that, if the company could acquire at 50¢ on the dollar $200,000 worth of its total outstanding stock, which amounted to $371,000, the company would not only be placed in a sound financial condition but would be in a favorable position to renew its application for the much desired federal insurance of its shares and to obtain such insurance. In pursuance of this plan, the Board passed a resolution on March 27, 1936 creating a committee, composed of the three individual defendants, Freudenstein, Bergeron and Maginnis, and authorized it to institute and conduct a campaign amongst the shareholders for the purpose of acquiring $200,000 of the outstanding stock of the association at a price not to exceed 50¢ on the dollar. This resolution states that the purpose of the formation of the committee was to benefit the financial condition of the association by wiping out the anticipated deficit, establish a reserve so that it might be possible to comply with the requirements of the United States Government, and ultimately qualify and obtain federal insurance for the homestead.
On April 2, 1936, the Board of Directors Committee mailed out a circular letter to all of the members of the association informing them of the fact that the committee had been created by resolution of the board on March 27, 1936 and that it, the committee, had decided to reduce the price the association would pay for the shares to $35, from and after April 22, 1936, until which date it would pay $50 per share. This letter also advised the stockholders that the net deficit of the homestead had increased during the previous three months from $16,652.63 to $42,918.95.
Thereafter, on April 8, 1936, the plaintiff addressed a letter to the association in which she expressed her surprise at the large increase in the deficit and asked whether the homestead had ever applied for federal insurance. On April 14, 1936, the Secretary of the homestead in reply to plaintiff's letter, advised her that the association had applied for federal insurance but that its application had been refused on August 16, 1935. *Page 795 
On April 15, 1936, the Committee again wrote to the shareholders reminding them that the offer of the homestead to pay $50 for its stock would expire on April 22d and that thereafter the price would be $35. On the same day, plaintiff wrote to the homestead stating that, in view of the increase of the deficit, she was doubtful whether it would be to the best interest of all stockholders to further prolong the agency by continuing to operate at a daily loss and she asked for advice as to what would be the best course for her to pursue. On April 17, 1936, the Secretary of the homestead answered this letter stating that, if plaintiff would call at the office of the homestead, the officials would be glad to discuss the matter with her fully. She was also advised that she could bring her attorney or a friend with her. On April 20th, plaintiff answered this letter stating, in effect, that she saw no reason to call at the office of the homestead and that she merely wished an answer to her question as to whether, in view of the losses sustained by the company, it would be advisable to continue the present operations. This letter was answered on the same day by the Secretary of the homestead and he advised that continued operations would be to the best interest of the homestead and certainly preferable to a judicial liquidation which would be very expensive and would result in greater losses to the stockholders. Two days later, on April 22, 1936, plaintiff sold her stock. Thereafter, the Board of Directors Committee, by continued efforts on its part, were successful in purchasing $195,000 of the homestead's stock at 50¢ on the dollar.
Correspondence in the record indicates that the Board of Directors and the Committee had much difficulty in inducing the shareholders to part with their stock or any portion thereof at 50¢ on the dollar and it was only after urgent and repeated requests that the association was able to repurchase the $195,000 worth of stock. On May 8, 1936, the Committee addressed a letter to the shareholders in which it directed attention to the fact that the State Bank Commissioner had advised all homesteads, which were then uninsured, that something would have to be done within the near future with respect to federal insurance and that, in case these uninsured homesteads were unable to obtain such insurance, he would be forced to place them in judicial liquidation. This letter urged the stockholders that, in view of the circumstances, they should sell at least one-half of their holdings at $50 per share, in order to place the company in a position where it could make a good showing at the time it applied for federal insurance. Similar communications were sent out by the Committee on May 14, May 27, June 10, June 13, August 5, August 11 and September 11, 1936. In all of these letters, the stockholders were asked to accept the reduced prices in order that the association could obtain federal insurance. In August 1936, a new application for federal insurance was made by the association and it was not until the month of December of the same year that the Federal Savings and Loan Insurance Corporation approved the application and granted the insurance.
The gravamen of plaintiff's charges in this case is that she has been defrauded by the acts of the defendants, who, she alleges, induced her to sell her stock at 50¢ on the dollar so that they, the directors, the committee and their friends, who had no intention of selling their stock at such a reduced rate, could reap the benefit of the sacrifices made by her and others similarly situated and receive 100 cents on the dollar for their own stock. In other words, the complaint is that the defendants fraudulently devised a scheme to unjustly enrich themselves at plaintiff's expense. It was because of these charges that we, in our first opinion (see La.App., 186 So. 757), reversed the judgment of the court below and sustained plaintiff's cause of action. Later, in a similar case (but where no allegations of actionable fraud were set forth), the Supreme Court maintained an exception of no cause of action in a suit by a stockholder of a homestead to have a sale of her stock to the homestead rescinded. See Wessel v. Union Savings Loan Ass'n, 198 La. 219,3 So.2d 594.
The evidence in the case discloses, beyond question, that there is no foundation in fact for plaintiff's charge that the Directors of the homestead conspired to recapture her stock for their own benefit. The record shows that, on January 27, 1936, the Directors of the homestead owned a total of $43,234.16 of its capital stock. Between that date and August 14, 1936 (or many months before the homestead acquired federal insurance), the directors sold, at 50¢ on the dollar, $30,934.16 of their holdings, retaining only $12,300 of stock which subsequently was insured. In *Page 796 
so far as the relatives of the directors are concerned, the record reveals that they owned, on January 27, 1936, a total of $29,986.44 of the capital stock of the homestead; that, between that date and June 25, 1936, they sold $27,615.58 of their holdings at 50¢ on the dollar and that they owned only $2,300 worth of stock at the time the company obtained federal insurance.
Thus it clearly appears that, instead of defendants conspiring to enrich themselves at plaintiff's expense they, in common with other stockholders, sold most of their stock for the benefit of the homestead in order that it could obtain federal insurance and avoid being placed in judicial liquidation by the State Bank Commissioner. The sacrifices made by them exhibit their good faith and that they were acting for the best interest of all concerned.
Counsel for plaintiff contends that, in spite of the fact that the Board of Directors had no intention of enriching themselves at plaintiff's expense, the defendants are, nevertheless, responsible because, — (1) they misrepresented to her the sound, or book value, of her stock, (2) because they failed to fully disclose their plan to purchase $200,000 worth of stock for 50¢ on the dollar, in order to reduce the homestead's liability to its stockholders and place it in a solvent condition, so that federal insurance could be obtained, and (3) because they, in bad faith, induced her to sell her stock for 50¢ on the dollar, by informing her that, after April 22, 1936, they would reduce the price of the stock to 35¢ on the dollar when they had no intention of doing so. And it is further argued that, in view of the fiduciary relationship existing between the defendants and the stockholders of the homestead, it is immaterial whether the alleged misrepresentations were made by the defendants in bad faith or not.
The first contention, that the defendants misrepresented the value of the homestead stock, is wholly without merit. The various communications mailed to the shareholders exhibit that the defendants made no representations with respect to the value of the stock. On the contrary, the defendants in their letters merely advised the stockholders that the homestead was offering to purchase stock at $50 per share. There is nothing contained in the communications which indicates that the defendants were conveying the idea that they considered $50 to be the value of the stock. The homestead had the right, under the law and the rulings of the State Bank Commissioner, to purchase its own stock at reduced prices. The obvious reason for offering to purchase the stock at $50 per share, or less than its book value, was to reduce the liabilities of the homestead and place it in a solvent condition so that federal insurance could be obtained.
The second proposition urged by plaintiff is that it was the duty of the members of the Board of Directors Committee to advise her of the plan to secure federal insurance by informing her that, in case $200,000 worth of stock was acquired at reduced prices, the application for such insurance would be renewed. The defendants' answer to this point is that it was common knowledge throughout the city of New Orleans that all homesteads were attempting to have their shares insured and that the only method by which this could be done was for the homesteads to acquire a large portion of their stock at reduced prices. Plaintiff maintains, however, that the only fair and just way for the association to have accomplished this desired result would have been for it to inform its members that, if all stockholders would be willing to sacrifice a sufficient proportion of their stock so as to reduce its liability to them to an amount equal to the sound value of its assets, then everyone would have been treated equitably and would have been required to make the same sacrifices and receive the same benefits, in case federal insurance was subsequently secured. There can be no question that such a plan would have been desirable, if it had been feasible. But, if we assume that the suggested plan would have been preferable, it does not follow that the plan formulated by the defendant homestead should be condemned, provided its Board of Directors were acting in good faith. And, when we consider the evidence in this case, we unhesitatingly hold that the defendants and the Board of Directors were acting at all times in good faith and did what they thought was in the best interest of the homestead and its stockholders. The record establishes the sincerity of the Board of Directors to our satisfaction. As soon as federal insurance was available, they applied for it. The *Page 797 
application was refused. After refusal of the application, the Board, being cognizant of the fact that, unless the homestead's liability to its stockholders was considerably reduced, there was no hope whatever of securing the insurance, devised the plan to repurchase a large portion of the association's outstanding shares at reduced prices. The only reason for the repurchase of these shares was to place the company in a solvent condition so that a new application for federal insurance could be made. The defendants and the employees of the homestead testify that this was a matter of common knowledge among the stockholders of homesteads in New Orleans and we recognized this to be a fact in our first opinion in this case when we said, "It is also obvious that the underlying purpose of the homestead's offer was to liquidate a large portion of its liabilities in order that the corporation might obtain insurance (for the shares not purchased by it) with the Federal Savings Loan Insurance Corporation." See La. App., 186 So. at page 762.
Plaintiff, however, states in her testimony that she had no knowledge whatever of the fact that the homestead intended to make a new application for federal insurance. But she also declares that her husband, Mr. John T. Knoop, attended to all of her affairs concerning her stock in the homestead and the record shows that Mr. Knoop employed an attorney-at-law, who consulted with him respecting the advisability of holding plaintiff's stock or disposing of it at the reduced price. In fact, this attorney dictated the numerous letters, which were mailed to the homestead in plaintiff's name and in which various questions were propounded as to whether it would be advisable, in view of its mounting losses, for the homestead to continue operations.
An examination of the testimony given by plaintiff's husband and the letters to the homestead, which were sent under the guidance of his attorney, has been sufficient to convince us that he had actual knowledge of all of the facts pertaining to the plan of the homestead and that he was well aware that the offer of the homestead to purchase its shares at reduced prices had for its underlying purpose the hope that federal insurance for the homestead might be ultimately secured. This conclusion is amply fortified by other evidence in the case to the effect that Mr. Knoop was fully acquainted with the plan of the homestead; that he had numerous discussions with Mr. Dwyer, formerly the Secretary of the company, and that Mr. Dwyer informed him of all of the details of the plan. This testimony was given by Mr. Albert J. Emke who was formerly the bookkeeper of the homestead and is presently its secretary. Plaintiff's counsel vehemently attacks the testimony of Mr. Emke and refers to certain alleged inconsistencies in the statement of the witness which he says warrant the deduction that the testimony is false. However, after scrutinizing the statement of Mr. Emke with care, we cannot find anything about it which would justify us in questioning his veracity.
The third point raised by plaintiff's counsel is that the defendants were guilty of bad faith in that they informed the shareholders in their communications that after April 22, 1936, the purchase price of the stock would be reduced from $50 to $35 per share when they had no intention of making such reduction at the time they made the representation.
On this point, the defendants explain that it had been the custom of the homestead, during the period in which it was repurchasing its stock, to set a time limit upon the price which was offered. We find nothing unseemly in making such a representation provided, of course, that the defendants were not actuated by a desire to gain an unfair advantage to themselves or their friends. And, since we hold that they were in good faith at all times, plaintiff has no cause for complaint. It is plain to us that, at the time defendants made the statement as to the contemplated reduction in the price of the stock, they realized that, if a time limit was not inserted in the offer, many stockholders would have delayed a decision until others had acted. Such inaction would have caused more delay and might have frustrated the entire plan. The time limit given to the shareholders was an ample period for them to deliberate and decide. At all events, we are not convinced that the time limit set by the Committee had any effect on the decision of Mr. Knoop. The truth of the matter is that Mr. Knoop, being fully conversant with the condition of the association, was faced with the question of determining whether it would be more *Page 798 
advantageous to hold on to plaintiff's stock or sell it. If the stock was held and the homestead had been unable to obtain federal insurance, judicial liquidation would have followed. In the condition of the real estate market at that time, a judicial liquidation would have unquestionably brought less to the stockholder than the price offered by the homestead. If, on the other hand, the homestead was able to acquire enough of its stock at 50¢ on the dollar so as to reduce its liabilities to a parity with its assets, federal insurance could be obtained and plaintiff would have reaped the benefit on such insurance. The decision made by Mr. Knoop to sell the stock was not, we think, predicated upon any representation made by the defendants but rather upon his belief, after considerable investigation, that it was the best course to pursue. In these circumstances recovery must be denied. The District Judge was of this opinion and we fully concur in his appreciation of the facts and law of the case.
Lastly, counsel for plaintiff complains with respect to a ruling of the trial judge in rejecting certain evidence pertaining to the dealings of the homestead with the Navillus Company. The transactions which counsel sought to investigate, by cross-examination of the homestead officials, occurred over a period of many years, beginning in the year 1921. The District Judge felt that the only pertinent inquiry in the case had reference to the alleged fraud in the purchase of plaintiff's stock. He, therefore, refused to permit counsel to pursue this line of cross-examination. We think that the ruling was correct.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
 *Page 72