# United States Court of Appeals
## For the First Circuit

No. 03-1303

WILLARD R. JERNBERG,

Plaintiff, Appellant,

v.

SALLY E. MANN,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Charles B. Swartwood, III, U.S. Magistrate Judge]

Before

Lipez, Circuit Judge,

Campbell, Senior Circuit Judge,

and Howard, Circuit Judge.

Franklin H. Levy with whom Eve M. Slattery and Dwyer & Collora, LLP were on brief for appellant.
James D. O'Brien, Jr. with whom Lisa D. Tingue and Mountain, Dearborn & Whiting, LLP were on brief for appellee.

February 19, 2004

**CAMPBELL**, <u>Senior Circuit Judge</u>.  This appeal is from a final judgment for defendant entered in the United States District Court for the District of Massachusetts following a jury trial. Plaintiff, Willard Jernberg, sued defendant, Sally Mann, for breach of contract, fraud, and breach of fiduciary duty.  Jernberg voluntarily dismissed the breach of contract claim, and the jury found in Mann's favor on the remaining counts.  On appeal, Jernberg challenges only the court's failure to instruct the jury that Mann had the burden of proving that Jernberg's sale of his corporation to her was fair and reasonable to him.

### BACKGROUND

In 1980, Jernberg founded the Jernberg Corporation, a company providing services to assist employees with personal problems like alcoholism, drugs, depression, and family concerns. He was the sole shareholder.  In 1981, Jernberg hired Mann, the eighteen-year-old daughter of his cousin, as an assistant. Jernberg and Mann were very close, and he considered her to be like a daughter.  The Jernberg Corporation grew tremendously over the course of the eighties and early nineties, benefitting in particular from obtaining Paul Revere Insurance Company (Paul Revere) as a client.  Paul Revere purchased employee assistance services for its own employees and for various disability policy holders.  For many years, Jernberg Corporation and Paul Revere dealt with one another without a contract, but in 1992, Jernberg,

-2-

after some shaky moments with Paul Revere management, negotiated a written agreement that paid Jernberg Corporation at a flat rate for the employees Jernberg Corporation serviced. Business boomed. At that time, Mann asked Jernberg to give her a right of first refusal if he ever decided to sell the company. He agreed.

Jernberg Corporation's profitability took a turn for the worse in 1993. Paul Revere amended its contract causing Jernberg Corporation to lose approximately one-third of its revenues and two-thirds of its individual accounts. That year, Jernberg relapsed into alcoholism. Mann helped him deal with the problem over the next three years, but Jernberg's involvement with Jernberg Corporation was reduced. Mann essentially ran the business from that point forward. In April of 1994, Jernberg named Mann President of Jernberg Corporation. Jernberg continued to be the sole shareholder and the Chairman of the Board. Although disputed, Mann's version of the facts is that Jernberg was kept current on the affairs of Jernberg Corporation by Mann, corporate counsel, the corporate controller, the corporate accountant and others.

At the end of 1994, Paul Revere informed Jernberg Corporation that it would not renew its contract after it expired in May of 1995. Months later, Jernberg again relapsed into alcoholism and went to a treatment program. On top of this, Jernberg Corporation was about to assume the burden of a very expensive office space lease. Around that time, Mann and Jernberg

began negotiations for the sale of the Jernberg Corporation to Mann. Mann expected Jernberg Corporation would lose other major independent accounts in the next year, but she was eager to accept the challenge posed by the termination of the Paul Revere account. She was frightened more by the possibility that she would be fired by a new owner than if the company failed with her at the helm. Further, she believed that if she took a smaller salary than Jernberg had in the past, she could weather a transitional phase while Jernberg Corporation reinvented itself. Jernberg was aware of the difficulties too, and he asked corporate counsel whether the company could avoid the office lease. Corporate counsel advised him that this was not possible. Jernberg concluded that his options were to keep the company and run it into the ground, find an outside buyer, or sell the company to Mann. According to Mann, throughout the negotiation, Jernberg continued to be provided with information about the affairs of the company. Ultimately, Jernberg concluded that no one other than Mann would be interested in purchasing the company, given that the loss of Paul Revere's business reduced its worth drastically. He further expressed a desire to help Mann for her hard work. Accordingly, he decided to sell the company to Mann.

Jernberg sold his stock to Mann in January of 1996. They executed a lengthy purchase and sales agreement, as to which they had the advice of counsel (although Jernberg contends that neither

the corporate accountant nor the corporate attorney were involved in the negotiation beyond being mere scriveners). Mann paid Jernberg $50,000 for the stock and agreed to pay him $160,000 over several years for consulting services (according to Jernberg, Mann paid only $33,000 for the stock). At that time, there was evidence the stock had a fair market value of $1.91 million. Shortly before the sale closed, Jernberg took $520,000 out of the corporation, together with an automobile, his 401K plan, and a large life insurance policy. He was relieved of any obligation under the lease. The contract also guaranteed Jernberg a "kicker payment" which would consist of a percentage of any differential between gross revenues for the years between 1996 and 1999.

Following Mann's purchase, Jernberg Corporation underwent many changes. Through aggressive marketing and new products, it was able to retain 50 percent of its accounts and broadened its base of customers. In November of 1999, nearly four years after she purchased the company, Mann sold her interest in Jernberg Corporation to Ceridian for approximately $2 million. According to Jernberg, at the time of sale, the majority of accounts, including Paul Revere, were those that had been established prior to Mann's purchase of the company. Furthermore, according to Jernberg, she made a total of over $4.1 million after totaling her salary, profits, and the sale of the company.

**DISCUSSION**

This appeal concerns the adequacy of the district court's jury instructions. Jernberg had submitted proposed jury instructions requesting the court to instruct that, "[t]he defendant bears the burden of proving that she disclosed all material information to the plaintiff when she purchased the Jernberg Corporation from him <u>and that the sale was fair and reasonable to the plaintiff</u>." [Emphasis supplied.] The district court instructed the jury both that Mann owed a fiduciary duty to Jernberg and that she bore "the burden of proving by a preponderance of the evidence that she disclosed all material information to Mr. Jernberg when she purchased the Jernberg Corporation from him or his stock from him." The district court did not, however, instruct that Mann had the burden of proving that the sale was fair and reasonable to Jernberg. It is this omission that plaintiff now asserts was error.[1]

This court reviews jury instructions de novo. <u>Seahorse Marine Supplies, Inc.</u> v. <u>Puerto Rico Sun Oil Co.</u>, 295 F.3d 68, 76 (1st Cir. 2002). The trial court's refusal to give a particular instruction constitutes reversible error "if the requested instruction was (1) correct as a matter of substantive law, (2) not

---

[1]No issue is raised on appeal as to the adequacy of the district court's instructions on Mann's duty to disclose to Jernberg all material information about the company's affairs.

substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." <u>United States</u> v. <u>DeStefano</u>, 59 F.3d 1, 2 (1st Cir. 1995) (internal quotation marks omitted). "An erroneous instruction will require a new trial only if the error was prejudicial, based on the record as a whole . . . ." <u>Tatro</u> v. <u>Kervin</u>, 41 F.3d 9, 14 (1st Cir. 1994).

Here, Jernberg contends that the court's instruction was substantively wrong because it omitted to require that Mann -- in addition to disclosing all material information -- bore the burden of proving that her purchase of the stock was fair and reasonable to the plaintiff.[2]

To justify imposing upon Mann this additional burden, Jernberg presents a two-stage argument. First, he calls attention

---

[2]While the court did not charge that Mann had the burden of proving that the stock transaction itself was fair and reasonable to Jernberg, it did include in its charge language that went some distance towards the latter concept. The court told the jury that Mann owed "a fiduciary duty to Mr. Jernberg who was the sole shareholder of the company." The court then described what such a duty meant, including that, as a fiduciary, Mann owed a duty of loyalty to the shareholders, and that "a duty of loyalty means essentially that a corporate officer owes a duty to the shareholders of <u>good faith and inherent fairness</u>. [Emphasis supplied.] This duty of loyalty means essentially that corporate officers, such as Ms. Mann, may not put their own personal interests ahead of those of the shareholders of the corporation, in this case, Mr. Jernberg, in her dealings with them or him."

As we point out below, this part of the charge may, in certain respects, have been more generous to Jernberg than Massachusetts law calls for. Be that as it may, the language went a considerable way towards indicating that the jury should satisfy itself that Mann not only made full disclosure but treated Jernberg with overall fairness.

to the law, well-known in Massachusetts as elsewhere, that a corporate officer or director owes a fiduciary duty of fair dealing in respect to corporate actions that may impact upon one or more shareholders. See, e.g., Jessie v. Boynton, 372 Mass. 293, 303-304 (1977). Jernberg, who was the company's sole stockholder when he sold his stock to Mann, would have us apply this rule so as to constitute Mann a fiduciary for Jernberg. (The court, in fact, so instructed the jury in this case. See supra note 2.) Building on the purported fiduciary relationship, Jernberg further contends that Mann's fiduciary role was of an "enhanced" variety, placing on Mann the burden to satisfy the jury that her purchase of Jernberg's stock was inherently fair and reasonable to him. The concept of enhanced fiduciary duty appears in Massachusetts cases holding that when a corporate fiduciary engages in "self-dealing" so as to be "on both sides" of a transaction, the fiduciary must show the transaction was done in good faith and was inherently fair to the corporation. See, e.g., Boston Children's Heart Foundation, Inc. v. Nadal-Ginard, 73 F.3d 429, 433-34 (1st Cir. 1996) (relying on Massachusetts law).

But Jernberg's argument overlooks that the enhanced fiduciary duty described in the case law is premised on the director's or officer's fiduciary duty to the corporation. While it is sometimes said that directors and officers owe a fiduciary duty to the corporation and its shareholders, any responsibility to

-8-

the latter is anchored in the duty to the former.  Otherwise, as noted in a Massachusetts practice treatise, "A director or officer of a corporation does not occupy a fiduciary relation to individual stockholders."  14A Howard J. Alperin and Lawrence D. Shubow, Massachusetts Practice Series, Summary of Basic Law § 8.85 (3d ed. 1996).[3]  Thus while directors and officers may not manipulate the corporation so as to prefer certain shareholders over others, and may not misuse their official positions so as to harm the corporation (and thus its stockholders) in order to advance their personal interests, their fiduciary obligations arise from and are bounded by the corporate relationship.  See, e.g., Demoulas v. Demoulas Super Markets, Inc., 677 N.E.2d 159, 180-82 (Mass. 1997).

Ordinarily, when a director or officer purchases the company's stock from another, the former is acting in a private capacity.  He or she is not acting in an official capacity on the company's behalf so as to be subject to the broad fiduciary constraints mentioned above.  This fact has been recognized in Massachusetts law, which has developed a separate and narrower set of rules specifically tailored to the purchases of stock by directors and officers.  In the leading case of Goodwin v. Agassiz,

---

[3]The treatise goes on to qualify this statement by noting that an officer or director who is also a majority stockholder owes fiduciary duties to the minority stockholders.  Also mentioned is the rule relevant to the present case, see infra, that a director or officer who purchases stock of the company may have a duty of disclosure to the selling shareholder.  Goodwin v. Agassiz, 186 N.E. 659, 661 (Mass. 1933).

186 N.E. 659, 660 (Mass. 1933), the Massachusetts Supreme Judicial Court held that, while the directors and officers of a commercial corporation "stand in a relation of trust to the corporation and are bound to exercise the strictest good faith in respect to its property and business," (emphasis added) they do not occupy a similar trust relationship toward individual stockholders in the corporation with respect to purchases of their stock. Id.; accord Gladstone v. Murray, Co., 50 N.E.2d 958, 960 (Mass. 1943) (stating, "It is true that Sawyer, as an officer of the company, was a fiduciary toward the company . . . . But Sawyer was not dealing with the company in buying the stock that he bought for himself . . . . His position as an officer and stockholder of the company did not of itself create a fiduciary relation between himself and a single stockholder whose stock he might buy."). This court has stated, citing Goodwin and other cases, "Absent special circumstances, an officer or director has no fiduciary duties in purchasing or selling stock under Massachusetts law." Janigan v. Taylor, 344 F.2d 781, 784 (1st Cir. 1965).[4]

_____

[4]While Goodwin was decided seventy years ago, it has not been overruled nor eroded by any of the court's later decisions. See, e.g., Rosenburg v. Lipnick, 389 N.E.2d 385, 388 (Mass. 1979) (in determining whether to invalidate antenuptial agreement for fraud, citing Goodwin as persuasive authority in support of proposition that duty to disclose may result from relationship of parties). More recently, the Massachusetts Appeals Court has relied upon Goodwin. See Wolf v. Prudential-Bache Securities, Inc., 672 N.E.2d 10, 13 (Mass. App. Ct. 1996) (citing Goodwin as example in which relief was found unwarranted after close scrutiny of circumstances of corporate director's purchase of stockholder's stock without

-10-

To be sure, the <u>Goodwin</u> court imposed upon corporate directors and officers a duty in certain circumstances to disclose material facts within their peculiar knowledge when purchasing stock. The court said that when an officer seeks out a stockholder in order to purchase stock, ". . . [he] cannot rightly be allowed to indulge with impunity in practices which do violence to prevailing standards of upright business men. Therefore, where a director personally seeks a stockholder for the purpose of buying his shares without making disclosure of material facts within his peculiar knowledge and not within reach of the shareholder, the transaction will be closely scrutinized and relief may be granted in appropriate instances." <u>Goodwin</u>, 186 N.E. at 661. In the instant case, the district court instructed that Mann had a duty to disclose material facts, and there is no claim the instruction was deficient.

But nothing either in <u>Goodwin</u> itself or elsewhere in Massachusetts case law suggests that an officer-purchaser of the

<hr>

prior disclosure of material facts within peculiar knowledge of director and not within reach of stockholder); <u>Greenery Rehabilitation Group, Inc.</u> v. <u>Antaramian</u>, 628 N.E.2d 1291, 1294 n.5 (Mass. App. Ct. 1994) (quoting portion of <u>Swinton</u> v. <u>Whitinsville Sav. Bank</u>, 42 N.E.2d 808 (Mass. 1942), which relies on <u>Goodwin</u>); <u>see also</u> <u>Chanoff</u> v. <u>U.S. Surgical Corp.</u>, 857 F. Supp. 1011, 1020-21 (D. Conn.) (citing, <u>inter</u> <u>alia</u>, <u>Goodwin</u> in support of proposition that "the weight of common law authority has rejected the contention, central to the plaintiffs' claim, that a corporate officer, merely by virtue of status, occupies a position of trustee toward individual stockholders in the corporation."), <u>aff'd</u>, 31 F.3d 66 (2d Cir. 1994); <u>Bailey</u> v. <u>Vaughan</u>, 359 S.E.2d 599, 602 n.4 (W. Va. 1987) (citing <u>Goodwin</u> with approval).

-11-

company's stock has a burden, over and above the duty of establishing adequate disclosure, to prove to the jury that the sale was, in addition, fair and reasonable to the seller in some general sense.  Nor has such an explicit burden of proof been called to our attention relative to a director's or officer's purchase of stock under the law of any other jurisdiction.  See generally 3A William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations, §§ 1168.10 & 1171 (2003).

As already noted, Jernberg bases his argument for the instruction on two shaky propositions -- the first being that, as a corporate officer, Mann owed a general fiduciary duty to a majority stockholder like Jernberg in respect to the purchase of his stock; and the second being that Mann engaged in self-dealing, leading to "enhancement" of her fiduciary duty to Jernberg.  In respect to whether Mann, in the instant transaction, owed Jernberg a general fiduciary duty, Massachusetts law, as just said, points to the contrary.  See supra note 3.  In Goodwin, the court stated quite specifically that the same duty of trust and strict good faith owed by directors and officers to the corporation itself did not extend from them to the individual stockholders.  Goodwin, 186 N.E. at 660.  See also supra note 3.  It is true Goodwin goes on to impose, in inter-personal stock purchases, a disclosure duty upon directors and officers, the court stating that directors are forbidden to withhold information within their peculiar knowledge

-12-

contrary to "prevailing standards of upright business men."  186
N.E. at 661.  But beyond requiring good faith disclosure of such
information, the court created no fiduciary role of a more general
nature for the purchasing director or officer.  Of course, the
disclosure duty described in Goodwin might itself be labeled a
type of limited fiduciary duty or perhaps, as some courts have
called it, a quasi-fiduciary duty.  See, e.g., Everdell v. Preston,
717 F. Supp. 1498, 1501 (M.D. Fla. 1989) (stating, "[o]ne point of
view, the apparent majority view, is that there is no fiduciary
duty owed to the individual stockholder.  A second view is that the
director may be considered a quasi trustee and there is a fiduciary
duty of full disclosure."); Lomman v. Lieb, 37 Pa. D. & C.2d 305,
307-308 (Cambria 1965) (stating, "[u]nder [the special facts rule],
where special facts or circumstances are present which make it
inequitable for the director or officer to withhold information
from the stockholder, there is a quasi-fiduciary duty to disclose
 . . . .") (citing 3 William Meade Fletcher, Fletcher Cyclopedia of
the Law of Private Corporations, §§ 1167-74); Markey v. Hibernia
Homestead Ass'n, 186 So. 757, 763 (La. Ct. App. 1939) (stating, "It
is generally held that, while a fiduciary relationship in a strict
sense does not exist as between the stockholder of a corporation
and an officer or director thereof, there is at least a quasi
fiduciary connection between the parties, particularly where it is
the duty of the director . . . to disclose matters within his

-13-

knowledge."). But the fact remains that in <u>Goodwin</u>, the court expressly rejected equating the comprehensive fiduciary duty owed to the corporation by a director or officer with any duty owed to an individual shareholder.[5] 186 N.E. at 660.

In respect to the notion of "enhanced" fiduciary duty, any analogy here is equally lacking. "Enhanced" fiduciary duty relates to an officer's duty to the corporation, not the officer's duty to an individual shareholder during a private stock sale. <u>Boston Children's Heart Foundation, Inc.</u>, 73 F.3d at 433 (must show transaction inherently fair <u>to corporation</u>). The concept of "enhanced" duty was developed in situations of "self-dealing," when a director or officer was on "both sides" of a transaction -- terms applicable when the fiduciary's primary duty to the corporation clashes with a countervailing personal interest in the same transaction. That concept is inapplicable to an officer's purchase and sale of stock such as here. Mann was not acting for the corporation when she purchased the stock from Jernberg; hence she was neither "self-dealing" nor on "both sides" of the transaction.

---

[5]We see nothing in the fact that Jernberg owned all rather than part of the stock of the company to constitute a reason or special circumstance such as to make Mann a fiduciary for Jernberg. Majority stockholders in close corporations may indeed themselves owe a fiduciary duty to minority stockholders, <u>Donahue</u> v. <u>Rodd Electrotype Co. of New England, Inc.</u>, 328 N.E.2d 505, 515-16 (Mass. 1975), but nothing in this or similar cases suggests that Mann's responsibility under <u>Goodwin</u> to Jernberg was enlarged simply because the latter owned all rather than just some of the stock. Indeed, one might argue that the fact pointed, if anything, in a contrary direction.

-14-

We, therefore, find no error in the court's omission of an instruction that Mann bore the burden of proving not only that she had made disclosure of all material facts known to her bearing on the stock sale, but that the transaction was fair and reasonable to Jernberg.  As pointed out previously, see <u>supra</u> note 2, the instruction given was actually generous to Jernberg insofar as it indicated that Mann owed an unqualified fiduciary duty to Jernberg including a duty of good faith and inherent fairness.

**<u>Affirmed</u>**.