Catherine Wood, Appellee, v. MacLean Drug Company et al., Defendants. MacLean Drug Company et al., Appellants.

Gen. No. 35,651.

6

Opinion filed March 28, 1932.

EMIL C. WETTEN, for appellants.

GOTTLIEB & SCHWARTZ, for appellee; ULYSSES S. SCHWARTZ and CLAUDE A. ROTH, of counsel.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

By this appeal defendants Harry E. White and Fred S. White seek to reverse a decree entered by the circuit court of Cook county whereby they were decreed to pay to the complainant, Catherine Wood, $317,910 with interest at 5 per cent from July 2, 1929.

The record discloses that on July 2, 1929, complainant filed her bill against the defendants claiming that the defendants Harry E. White and Fred S. White had conspired to defraud her of 500 shares of the capital stock of the defendant MacLean Drug Company; that about August 8, 1928, the two Whites, who were officers and directors and controlled the affairs of the MacLean Drug Company, caused the MacLean Drug Company to purchase complainant's 500 shares of stock for $200 a share when the stock was worth more than $800 a share. The defendants Harry and Fred White filed an answer and denied all charges of wrongdoing.

The case was referred to a master in chancery who took the evidence, made up his report and found that the two Whites had defrauded the complainant, their aunt, and recommended that a decree be entered in complainant's favor. The decree was substantially in accordance with the master's report. It found that in the purchase of complainant's 500 shares of stock she was defrauded of $317,910, and it was decreed that the defendants Harry E. and Fred S. White pay this sum to her; it was further found that defendant Archibald M. Wood, son of complainant and an officer and director of the MacLean Drug Company, was not guilty of any fraud in the matter, but that he had received $47,911.74 more from the proceeds of the 500 shares of stock than he would have received had the sale been fairly made, and it was decreed that he pay this sum to complainant, but not in addition to the $317,910.

It appears from the evidence that Alexander MacLean started in the drug business in Chicago and formed a corporation for that purpose in 1908, the capital stock being $10,000, of which he owned 49 of the 100 shares. The business grew and the capital was increased from time to time and new drug stores were opened by the drug company. Alexander MacLean dominated the company until he sold out his interests

January 1, 1924, to George R. Wood, his brother-in-law and husband of complainant, and his two nephews, Harry E. and Fred S. White. At that time the drug company operated about 15 drug stores in Chicago. Harry E. White, Fred S. White and George R. Wood came to Chicago and were employed by the drug company during the years 1910 and 1911. George R. Wood died January 13, 1927, and his 400 shares of stock in the drug company were bequeathed to the complainant, his widow. At the time in question there were 1,713 shares of common stock in the MacLean Drug Company, held as follows: Harry White 567 shares, Fred White 335 shares, Archibald Wood 186 shares, Alice White, wife of Harry E., 97 shares, Nina White, wife of Fred S., 28 shares, Mrs. Catherine Wood 500 shares.

For some time prior to the death of George R. Wood in January, 1927, Harry E. and Fred S. White, Archibald Wood and George R. Wood, his father, were all stockholders and were employed by the drug company at substantial salaries. George R. Wood was drawing $12,000 a year. Since 1923 it was the policy of the company to pay no dividends on the common stock, but a great part of the earnings were from time to time invested in opening new stores. At the time in question Harry E. White was president, Fred S. White vice president, and Archibald Wood secretary and treasurer of the company; they were also directors, and the business was dominated by the Whites. After George R. Wood died Harry E. White's salary was raised from $15,000 to $20,000, Fred S. White's from $10,800 to $15,000, and Archibald Wood's from $8,000 to $10,000 a year.

The evidence further shows that Catherine Wood after the death of her husband had very little income; that the principal part of her property was the 500 shares of stock of the drug company, on which no dividends were being paid. She was desirous of disposing of her stock to the company or to the Whites and

the matter was taken up with them by Mrs. Wood; later her brother, the founder of the drug company, Alexander MacLean, came to Chicago and endeavored to induce the Whites, or the drug company, to buy Mrs. Wood's stock. From time to time such negotiations were had by Mrs. Wood through her attorneys, D'Ancona & Pflaum. The Whites agreed to pay the book value of the stock and this was ascertained to be somewhat in excess of $200 a share. A number of draft agreements were prepared whereby complainant was to receive about $12,000 in cash and $100,000 of preferred stock, and there was a provision in these tentative agreements that in case the drug stores were sold within a year Mrs. Wood was to receive her share as though she still owned the stock. When the final draft of the agreement to purchase and sell the 500 shares of stock was prepared it was suggested that instead of paying for the stock in preferred stock and $12,000 cash, Mrs. Wood be paid $100,000 in cash. After considering this proposition for about a day it was accepted by Mrs. Wood, and on August 9 there was a special meeting of the directors of the drug company, at which Harry E. White, Fred S. White and Archibald M. Wood, being a majority of the directors, were present. A resolution was unanimously passed that the MacLean Drug Company purchase the 500 shares of stock of Catherine Wood for $100,000 in cash. Thereupon the drug company borrowed $50,000 and through the sale of securities obtained the other $50,000. On August 11, the money was paid to Mrs. Wood and the stock delivered by her. Thereupon she left for California to visit a sister who was seriously ill.

About the time of this sale the Liggett Company, which was operating a large chain of drug stores in this country, entered into negotiations for the purchase of the MacLean drug stores, and Archibald Wood, on August 22, notified his mother in California of this

fact. Negotiations with the Liggett Company resulted in the sale of the stores on September 29, 1928. The sale was for approximately a million and a half dollars. Afterwards most of the proceeds of the sale were distributed among the two Whites and Archibald Wood according to the number of shares held by them, the two Whites receiving the proceeds represented by the stock held by their respective wives.

The master found from the evidence that after payment of certain bills and expenses there was $1,431,764.59, or $835.82 per share to be distributed to the Whites and Archibald Wood. Most of this has been distributed. Included in the above sum was an item of $18,681.05 which the two Whites and Archibald Wood had divided among themselves according to the number of shares of stock held by each. This money, which was in the nature of rebates, had been paid by an ice cream company and a coffee concern, both of which sold their produce to concessionaires of the MacLean drug stores. These rebates had been paid for a number of years, and George R. Wood during his lifetime obtained a share, but after his death all of the rebates, as stated, were divided among the Whites and Archibald Wood. The master found that these moneys belonged to the MacLean Drug Company, and we think rightfully so, and that Mrs. Wood was entitled to share in the $18,681.05.

Mrs. Wood upon being advised in August, 1928, of the proposed sale of the stores to the Liggett Company, did nothing to repudiate the sale of her stock and made no complaint. She came back to Chicago in the spring of 1929 and employed counsel, who after investigating the facts filed the bill on July 2, 1929.

The evidence further shows that in the fall of 1927, and in the spring of 1928, the Walgreen Company, which also operates a large chain of drug stores, entered into negotiations with the MacLean Company with a

view of purchasing its stores, and while no agreement was reached, we think the evidence shows that the Walgreen Company made a tentative offer to pay about $600 a share for the common stock of the MacLean Company. It further appears that about May, 1928, the Whelan Drug Company, a subsidiary of the United Cigar Stores Company of America, approached the Whites with a view of buying the drug stores of the MacLean Company; that negotiations were carried on for some time; that White said the MacLean Company wanted $1,500,000 for the stores and that the Whelan Company made a tentative offer of about $1,250,000. About the same time two Chicago lawyers who represented the Liggett Company, but who did not disclose this fact, approached the Whites with a view of buying the MacLean stores. The Whites refused to deal with them unless they knew who their principals were, and about August 8 these lawyers again took the matter up with the Whites and stated they represented the Liggett Company, and negotiations were then carried on until the stores were sold, as above stated, September 29, 1928.

The evidence all shows that neither Archibald Wood nor his mother, the complainant, knew anything about these several negotiations for the sale of the stores. The Whites were the only ones connected with the MacLean Drug Company who had such negotiations and they did not disclose the facts to anyone, although the evidence shows that on a number of occasions Archibald Wood asked the Whites if the stores were to be sold and was advised that they were not and that there were no negotiations pending at the time of the purchase of Mrs. Wood's stock in August. All of the evidence shows that the first information Archibald Wood had of any of these proposed purchases was about the time he wrote his mother August 22, 1928, and that was the first time she learned the fact.

The Whites take the position, and they so testify, that they did not consider when they were approached by Walgreens, Whelan, the two lawyers and the Liggets that these were negotiations but more in the nature of parties endeavoring to ascertain whether the stores might be bought, and that no specific offers were made by these parties for the stores. But we think the evidence justifies the finding that the three parties were negotiating for the purchase of the stores and made rather tangible and specific offers for them. There is a conflict in the evidence as to whether the Whites induced Archibald Wood to use his influence with his mother to sell her stock to the MacLean Company. Wood gave testimony by deposition taken in California that the Whites had induced him to try to influence his mother to sell the stock, while the White's testimony is to the contrary; and further that Mrs. Wood, their aunt, was pressing them for months to buy her stock. There is considerable evidence outside of the testimony of the Whites to the same effect. It is undisputed that she spoke to one of the Whites about selling her stock, and later her brother, Alexander MacLean, the founder of the Drug Company, endeavored to have the company or the Whites buy her stock and she retained able counsel in this behalf. But in the view we take of the case, we think this question is not of controlling importance because we are of the opinion that it was the duty of the company and the directors in control of it to disclose all the facts to Mrs. Wood with reference to the value of the stock, and that Walgreen, Whelan and Liggetts had been inquiring about the purchase of the drug stores.

The MacLean Drug Company was practically a family affair, owned and controlled by the two Whites, nephews of complainant, and her son Archibald. Mrs. Wood had little or no business experience. The book value of the stock would not disclose what the stock might be sold for. There was naturally no record kept

by the MacLean Company of the fact that a number of substantial concerns were negotiating to purchase the stores.

Under the facts in this case we are of the opinion that when the Whites, as directors of the MacLean Drug Company, together with Archibald Wood, passed the resolution authorizing the purchase of Mrs. Wood's stock, they were acting as trustees for the drug company, for Mrs. Wood and other stockholders, and therefore it was their duty to disclose all the facts. *Hooker v. Midland Steel Co.*, 215 Ill. 444; sec. 2270, vol. 4, Fletcher Cyc. Corporations; *Strong v. Repide*, 213 U. S. 419; *Dawson v. National Life Ins. Co. of America*, 176 Iowa 362.

In the *Hooker* case, Hooker, a stockholder of the Midland Steel Co., sold his stock in the company to Ross J. Beatty, the president of the company, for an inadequate price, and it was alleged that Hooker was unable to determine the reasonable value of his stock through the action of Beatty in failing to disclose the facts. The court said it was the apparent purpose of the bill to hold the status so as to ascertain the facts, that plaintiff might determine at his leisure "whether it would be more profitable to him to retain the money (he had received for the stock) and let Beatty keep the stock or accept the offer. . . . We do not think that a court of equity is to be used merely for the purpose of enabling complainant to determine whether he can make more money by affirming or disaffirming the sale"; and the dismissal of the bill was affirmed. The court there further said (pp. 450–451): "It is contended that Beatty, being the president and director of the Midland Steel Company, was a trustee for the complainant as a stockholder, and was therefore in a fiduciary and confidential relation requiring him to disclose all such facts within his knowledge, and that he could not retain a benefit acquired by a breach of that duty or use knowledge in his possession to obtain a

bargain from the complainant. The management of the business and property of a corporation is entrusted to its officers, and they are empowered to act for the whole body of stockholders. They therefore occupy the position of trustees for the stockholders as a body in respect to such business and property, and cannot have or acquire any personal or pecuniary interest in conflict with their duty as such trustees. A director, however, does not sustain that relation to an individual stockholder with respect to his stock, over which he has no control whatever, but he may deal with an individual stockholder and purchase his stock practically on the same terms as a stranger.'' And the court continuing, quoted from Cook on Stock and Stockholders as follows: '' 'There is no confidential relation between him and a stockholder, so far as a sale of the stock between them is concerned, and so long as he remains silent and does not actively mislead the person with whom he deals the transaction cannot be set aside for fraud.' Beatty did not sustain such a trust relation to the complainant, as an individual stockholder, as would prevent him, in the absence of actual fraud, from purchasing the stock.'' In that case it will be noted that the president of the company, who was a director, individually bought Hooker's stock for himself. He was not acting for the corporation nor as a director of the corporation, and therefore the court held that there was no trust relationship between them in the transaction. But it will also be noted from the quotation above, that if Beatty was acting as a director of the corporation in the purchase of the stock, there would be a trust relationship between him and Hooker, the stockholder. As quoted, the board of directors when acting as such ''occupy the position of trustees for the stockholders as a body . . . and cannot have or acquire any personal or pecuniary interest in conflict with their duty as such trustees.''

In the instant case, when the board of directors of the MacLean Drug Company, acting as such board, bought Mrs. Wood's stock, not for the individual directors personally but for the MacLean Drug Company, a corporation, they were acting in their official capacities as directors, and under the law as stated in the *Hooker* case, we think they were acting as trustees for Mrs. Wood and were in duty bound to advise her of all the facts; not having done so, she is entitled to recover the balance of the value of her 500 shares.

In Fletcher's Cyclopedia Corporations it is said, sec. 2270: ''Sometimes it is said that a director or other managing officer is a trustee in so far as the corporation and its stockholders are concerned, and sometimes it is said that he is a trustee only as to the corporation itself. However, the better rule seems to be that he is a trustee for an individual stockholder, as well as the corporation, at least in a limited sense. Thus, Justice Lamar, in a Georgia decision, said that the fact that a director is a trustee for all the stockholders 'is not to be perverted into holding that he is under no obligation to each. The fact that he must serve the company does not warrant him in becoming the active and successful opponent of an individual stockholder with reference to the latter's undivided interest in the very property committed to the director's care. That he is primarily trustee for the corporation is not intended to make the artificial entity a fetich to be worshipped in the sacrifice of those who, in the last analysis, are the real parties at interest. No process of reasoning and no amount of argument can destroy the fact that the director is, in a most important and legitimate sense, trustee for the stockholder. . . . Not a strict trustee, for he does not hold title to the shares, not even a strict trustee who is practically prohibited from dealing with his *cestui que trust;* but a quasi trustee as to the shareholder's interest in the shares.' ''

And in *Strong v. Repide,* 213 U. S. 419, it was held that even though a director of a corporation may not be under the obligation of a fiduciary nature to disclose to a stockholder his knowledge affecting the value of the shares of stock, yet that duty may exist in special cases. There the plaintiff owned 800 shares of the stock of a company in the Philippines and the defendant owned about three-fourths of the stock. He was one of five directors and was the general administrator of the company. The United States Government was proposing to buy lands owned by the company, which would greatly enhance the value of the stock, but the facts were not disclosed to the stockholders and it was held that such a sale might be set aside at the suit of the stockholder who did not get the value of her stock. The court there said, p. 431: ''If it were conceded, for the purpose of the argument, that the ordinary relations between directors and shareholders in a business corporation are not of such a fiduciary nature as to make it the duty of a director to disclose to a shareholder the general knowledge which he may possess regarding the value of the shares of the company before he purchases any from a shareholder, yet there are cases where, by reason of the special facts, such duty exists.'' And in that case the court held there were such special circumstances.

In the instant case the Whites, having failed to disclose the fact that negotiations had been pending for some time with three companies conducting chain drug stores, ought not be permitted to take advantage of Mrs. Wood under the circumstances disclosed by the evidence.

The Whites further contend that the decree is wrong and should be reversed because the complainant was guilty of laches. We think this contention cannot be sustained. While it is true complainant learned of the impending sale of the drug stores to Liggetts in Au-

gust, 1928, after she had gone to California to see her sister who was there ill, and did not take any action in the matter until about seven months afterwards, when she returned to Chicago and employed counsel and about three months later filed the suit, yet we think this ought not to bar her, because under the law the length of time that elapses before a party asserts his rights, which would show the party was guilty of laches, varies with the particular circumstances of each case. *Schultz v. O'Hearn,* 319 Ill. 244. Under the facts disclosed by the evidence, we think the delay did not so prejudice the rights of the Whites as to bar the complainant from maintaining her suit. No rights of third parties have intervened, and we think the defendants ought to be required to pay the complainant what her stock sold for.

Complaint is also made that the court erred in decreeing a permanent injunction against the escrow fund which was a part of the proceeds derived from the sale of the drug stores to the Liggetts and placed in escrow. The preliminary injunction was issued in respect to this same fund and on appeal to this court we affirmed the order awarding the preliminary injunction. *Wood v. MacLean Drug Co.,* 262 Ill. App. 644 (Abst.). We think the facts that were before us on the preliminary injunction are not materially different from the facts before us on this appeal, and for the reasons stated in the opinion which we heretofore filed on the appeal from the preliminary order, we think the injunction was properly made permanent.

The decree of the circuit court of Cook county is affirmed.

*Affirmed.*

McSurely and Matchett, JJ., concur.