Hattie A. JOHNSON et al.

v.

MANSFIELD HARDWOOD LUMBER
COMPANY.

Civ. A. No. 5562.

United States District Court
W. D. Louisiana, Shreveport Division.

Aug. 10, 1956.

John M. Madison, Vernon W. Woods, Wilkinson, Lewis, Wilkinson & Madison, Shreveport, La., Ned A. Stewart, Texarkana, Ark., J. W. Patton, Jr., Lewisville, Ark., for plaintiffs.

Sidney M. Cook, Charles D. Egan, Frank M. Cook, Cook, Clark, Egan, Yancey & King, Shreveport, La., for defendant.

BENJAMIN C. DAWKINS, Jr., Chief Judge.

A program of corporate purchase of minority stock, as treasury shares, has reaped a whirlwind of bitterness, resulting in this three-pronged action.

Brought here under the Diversity Statute[1] by eight · plaintiffs, and addressed to our equitable powers, the suit is for a preliminary injunction, for rescission of certain stock sales made by plaintiffs to defendant in 1953, and for an accounting.

In their verified complaint, supported by various documents, plaintiffs pitch their claims on charges of deliberate fraud, or, alternatively, upon constructive fraud and unjust enrichment. They allege that, in 1953, defendant, Mansfield Hardwood Lumber Company (sometimes called "Mansfield"), through its President, A. S. Johnson, and its Vice-President, Brown McCullough, fraudulently conceived a scheme through which it induced them to sell their stock in the company to it, on the pretense that no dividends would be paid for the next fifteen to twenty years, that all profits would be reinvested in a reforestation program on its extensive land holdings, and that the corporate assets would not be liquidated and distributed to its shareholders in the foreseeable future.

At that time Mansfield's outstanding capital stock consisted of 4,836 shares, of which plaintiffs owned 1,516 shares, or approximately 33 per cent. It is alleged that the corporate management, together with others dominated by them, owned 2,751 shares, or approximately 56 per cent of the total, giving that group full control of its affairs.

Plaintiffs aver that all of them, except Mrs. Hattie Johnson and Mrs. Jeanette Johnson Jennette, sold their stock to the company for $350 per share, and the latter two, owning 547 and 668 shares, respectively, sold theirs for $400 per share. All plaintiffs contend that in doing so they accepted as true, and relied upon, the representations made to them by Mansfield's officers that no dividends would be paid for many years, and that no liquidation and distribution of the company's assets would be made. Since its stock was closely held, mostly by members of the same two families, was not traded on the open market and, accordingly, had no established market value, they also relied, they say, on the officers' statements as to the intrinsic value of the stock, for which they first were offered $300 per share.

Plaintiffs further say that, in arriving at their estimates of stock value, they placed strong reliance upon defendant's annual Balance Sheets, prepared and distributed to stockholders by the management. Copies of two of these statements are attached to the complaint. Under the heading of "Assets", as of June 30, 1952, one of the larger items was "Timber and Timber Lands", then valued at $969,234.-03. The Balance Sheet of June 30, 1953, gave these assets a value of $987,674.84. Actually, but allegedly unknown to them at the time, the true value was almost $9,000,000.

1. 28 U.S.C.A. § 1332. Plaintiffs are resident citizens of Arkansas and Louisiana. Defendant is a corporate citizen of Delaware, with its principal office and place of business in Shreveport, Louisiana. Substantially more than $3,000 is in controversy.

Thus deceived, they turned in their stock for the prices mentioned, and were paid by the company with corporate funds, the last sales having been consummated by Mrs. Johnson and Mrs. Jennette on November 14, 1953.

Plaintiffs next aver that, notwithstanding such representations by Mansfield's officers, both as to stock values and the lack of prospects for liquidation, they began negotiations for sale of the corporate assets within a few months after the stock had been bought. On September 26, 1955, defendant's then officers, directors, and remaining stockholders voted to liquidate completely, selling all, or substantially all, of the assets. To that end, on May 25, 1956, it sold all of its timbered lands, comprising about 93,000 acres, to Robert Gair Company, Inc., for $8,823,000, $5,000,000 being paid in cash, and the balance represented by a mortgage note for $3,823,000, bearing 3 per cent per annum interest, payable in five years. All minerals underlying these lands were reserved to defendant, to be distributed pro rata to its remaining stockholders. A lumber mill owned by defendant, at Winnfield, Louisiana, was sold for $285,000, on September 29, 1955, and another mill at Zwolle, Louisiana, was sold on May 25, 1956, for $75,000. Another asset, the Reader Railroad in Arkansas, was sold for an unascertained amount. No one apparently knows the exact total worth of the minerals reserved for distribution.

Plaintiffs calculate that defendant's assets will realize, or be worth, approximately $10,000,000, from which each share of the remaining stock will receive about $3,000, as contrasted to the $350 and $400 per share they received. If they had not sold their shares, in reliance on defendant's representations, they now would be entitled to receive more than $2,000 per share. Thus, they say, defendant obtained stock worth approximately $3,300,000 for $609,200, or about 18 per cent of the true value.

As stated, plaintiffs claim that all this resulted, to their serious detriment, from a fraudulent scheme on the part of defendant's officers, Johnson and McCullough. In the alternative, in the event it is determined that no deliberate fraud was practiced, plaintiffs contend that in their sale and defendant's acquisition of the stock they and defendant neither understood the true value of the rights being sold and acquired, and because of this mutual error of fact the sales were invalid.

In the further alternative, plaintiffs contend that in acquiring their stock defendant used cash and credit which equitably belonged to them and that, accordingly, no consideration was paid for the stock, or such consideration as was paid was not serious, and the sales were invalid.

In the still further alternative, plaintiffs urge that the price paid by defendant was so utterly out of proportion to the true value of the stock as to render the consideration vile, and to permit those who stood in a fiduciary relationship to plaintiffs to enrich themselves unjustly at plaintiffs' expense, and, therefore, that the sales were invalid.

Plaintiffs pray for a decree rescinding the sales of their stock to defendant, recognizing them as its equitable owners, requiring defendant to account to them for their share of the liquidation proceeds, and to deliver to them their proper part of the mineral rights reserved for distribution. They further allege that defendant is about to distribute a large amount of cash on hand, and to be received, to the remaining shareholders, and proposes to transfer to them title to undivided interests in the minerals, which would make it possible for third persons to acquire indefeasible interests therein, all to plaintiffs' irreparable injury. Accordingly, they have asked for, and were granted, a temporary restraining order, renewed each ten days since the suit was filed on June 22, 1956, to hold matters in status quo until determination of the suit on its merits. They further pray for a preliminary injunction for the same purpose.

Defendant has filed a motion to dismiss, encompassing several points of de-

fense, and a verified answer with supporting documents, which vigorously denies the alleged fraud and asserts additionally a number of affirmative defenses. While admitting generally that plaintiffs are former stockholders, who sold their stock to it for the amounts mentioned, partly at the behest of Johnson and McCullough, defendant contends that all statements made by them, in the negotiations leading up to the sales, were completely honest and factually correct. It further contends, with particular respect to the stock purchased from Mrs. Johnson and Mrs. Jennette, that they were thoroughly familiar with the company's affairs; that they initiated the negotiations and in effect importuned defendant to buy their stock, which constituted about 80 per cent of the total purchased, being all but 281 shares out of 1,516 which were bought; that defendant did not have sufficient cash or liquid assets on hand to pay the entire purchase price ($494,000); hence, it paid them $121,500 in cash, giving its notes for the balance, due serially each six months, secured by a mortgage on 11,845 acres of its property; that it paid the notes as they matured, and on May 25, 1956, it called the remainder of the unpaid notes, as was its privilege under the mortgage, paying the full balance of principal and interest, plus a 2 per cent charge for the privilege of calling the notes prior to their maturities. Defendant also alleges that, in addition to the payments already mentioned, it caused to be paid to Mrs. Johnson and Mrs. Jennette a sum equal to a 2 per cent dividend upon their stock, which payment was made some time subsequent to the consummation of the stock sale. Accordingly, defendant contends that by their actions they have ratified, confirmed and made valid their sale of stock to it, and now are estopped to bring this action to rescind it.

It further contends that it did not "immediately" begin to look for a sale of its timbered lands, after it had purchased plaintiffs' stock, but admits that in about the month of April, 1954, it began to negotiate with International Paper Company for that purpose. It further admits that on September 29, 1955, it agreed to sell those lands to the Gair Company, reserving all mineral rights, for $8,823,000.

While admitting that it was a closely held corporation, it denies that there was no market price for its stock; and it denies that plaintiffs had no accurate knowledge of the value of the company's assets, but, on the other hand, affirmatively alleges that they had representatives on the Board, as well as having participated in stockholders' meetings, and that they were entirely familiar with the company's assets.

It admits that the company followed the custom of circulating annual financial statements among its stockholders, but affirmatively alleges that these were accurate and correct according to the company's books. It denies that the statements made in the Balance Sheets of June 30, 1952 and 1953, were in any sense incorrect or that plaintiffs were required to evaluate their shares solely upon such statements. It affirmatively avers that the company's books, from which the statements were taken, were the usual and customary books in such a business, and that, in evaluating their shares, plaintiffs considered the nature and value of the assets rather than the book values alone.

Defendant further urges that the corporate liquidation now has been largely completed and that plaintiffs are without right to enjoin its further liquidation. If defendant is enjoined, it avers that a tax consequence, amounting to a $1,500,000 loss, will occur, due to defendant's inability to complete the plan of liquidation previously submitted to, and approved by, the United States Department of Internal Revenue, within one year from September 26, 1955. It further urges that should the injunction issue damages of approximately $150,000 per year will accrue because of nondistribution to the remaining stockholders of amounts realized from the liquidation.

Defendant next alleges that, if plaintiffs are entitled to any relief, which is

denied, they have an adequate remedy at law. It avers that all plaintiffs had full knowledge as early as July of 1955, and prior thereto, of the company's proposed plan of liquidation; that defendant's position has changed substantially since it purchased plaintiffs' stock and since July of 1955; that plaintiffs, therefore, are barred by their own laches and are without equity in failing to exercise promptly their alleged equitable right to rescission and an accounting. Accordingly, defendant prays that plaintiffs' demands be rejected at their cost. They also argue that, on consideration of all the pleadings and attached documents, plaintiffs have not shown themselves to be entitled to equitable relief. Hence, their application for a preliminary injunction should be denied.

The motion to dismiss, which must be considered first, makes these points:

1. The complaint fails to state a claim upon which relief can be granted.

2. This is an action for rescission of a sale in which there is no allegation of tender by plaintiffs to defendant of the consideration received by plaintiffs from defendant pursuant to the sale.

3. If plaintiffs are entitled to any relief, which is denied, they have an adequate remedy at law.

4. The complaint affirmatively shows that defendant's position has so changed since the sale that it would be impossible for it to comply with an order granting the relief sought.

5. The complaint affirmatively shows that, if plaintiffs are otherwise entitled to relief, which is denied, they are barred by their own laches.

6. The complaint affirmatively shows that the alleged fraudulent scheme, and the alleged misrepresentations made pursuant thereto, were entered into by and were made on behalf of McCullough and Johnson, as stockholders, and other unnamed stockholders, and not on behalf of the corporation.

7. That there is a non-joinder of indispensable parties defendant, namely, the remaining twenty-four shareholders, whose interests will be directly affected by any decree rendered herein.

8. That there is a misjoinder of parties plaintiff, whose claims do not arise out of the same transaction, occurrence, or series of transactions or occurrences. These points will be considered seriatim.

1. Defendant's general motion to dismiss for failure to state a claim upon which relief can be granted naturally admits all well-pleaded facts in the complaint. If plaintiffs' allegations are true, they clearly would be entitled to the relief they seek. No citation of authority is required to demonstrate that this part of defendant's motion must be, and is, denied.

2. In support of its position that plaintiffs must have made, and must allege, a tender to defendant of the amounts paid by it for plaintiffs' stock, as a prerequisite to this action, defendant relies on a decision by a former member of this Court, now retired, Hollinquest v. Kansas City Southern Railway Co., 1950, 88 F.Supp. 905, 907, wherein one of present plaintiffs' counsel was the attorney for the defendant.

There, a personal injury damage suit, it was alleged that an agent of the defendant paid the injured person $100, and obtained a release, shortly after the accident, while she was in such physical and mental condition that she could not appreciate what she was doing, and when she had no opportunity to know or understand the extent of her injuries. Defendant pleaded lack of tender, and the Court ruled as follows:

"Defendant urges the well settled jurisprudence of this state that, as a condition precedent to an action to annul a contract on the ground of fraud, error or mistake, the complainant must allege an offer to return what was received thereunder and the refusal of defendant to accept it. Byrne v. Hibernia National Bank, 31 La.Ann. 81; Ackerman v. McShane, 43 La.Ann. 507, 9 So. 483; Johnson v. Shreveport Waterworks Co., 109 La. 268, 33 So. 309.

In this case the plaintiff does not allege even an informal tender, but charges: 'The defendant has contended and does now contend that the instrument purporting to relieve it of all liability to plaintiff Bessie Hollinquest is valid and binding. Therefore, it would be futile for said plaintiff to make a formal tender of the One Hundred Dollars ($100.00) received at the time of the confection of the said instrument, since an acceptance by defendant of this tender would serve to automatically invalidate the instrument.'

"It is not believed that this is sufficient. The authorities cited by plaintiffs are largely those from other states, whereas here we are bound by the law of Louisiana. See La. Code of Practice, Art. 407, and La. Revised Civil Code of 1870, Arts. 2167–2169; MacLeod v. Hoover, 159 La. 244, 105 So. 305; Harrison v. First National Life Insurance Co., La.App., 179 So. 123; Certified Roofing Co. v. Jeffrion, La.App., 22 So.2d 143, and cases cited therein. The effect is to bar the action of the wife, until an offer to return the $100 has been made. This does not necessarily require the dismissal of the complaint, as tender could be made even during the trial, but since the issue has been raised, it should be done before that event. It will, therefore, be necessary for the plaintiff to make the offer and to amend or otherwise place of record defendant's acceptance or refusal. The question of the alleged nullity on the ground of fraud is one of equitable jurisdiction and will have to be heard and decided by the court, before the action at law for damages to the wife can be heard, either by the court or a jury."

We note that in the latest decision cited, Certified Roofing Co. v. Jeffrion, La. App., 1945, 22 So.2d 143, 146, that Court excused that plaintiff from making tender because it would have been refused by the defendant, stating:

"It is conceded that there was no formal, legal tender of the return of the money which had been paid but on the other hand it is proven by the testimony of Dejoie, himself, that Mr. Midlo offered to return it and urged him to come to his office to get it, and that he refused to accept it and insisted that he had made a complete and binding compromise. Dejoie also says that he fortified himself in his position by securing the advice of an attorney who advised him to retain the note and not to accept the return of the money. Under such circumstances there was no necessity that the futile ceremony of making a formal tender be resorted to. See McStea & Value v. Warren & Crawford, 26 La.Ann. 453; Alter v. Shepherd, 27 La.Ann. 207; Zimmermann v. Langles, 36 La.Ann. 65; Frey v. Fitzpatrick-Cromwell Co., 108 La. 125, 32 So. 437; Central Hardware Co., Inc., v. Elliott, 3 La. App. 572."

For their part, plaintiffs here rely on a decision by the Louisiana Supreme Court, American Guaranty Company v. Sunset Realty & Planting Company, 208 La. 772, 23 So.2d 409, rendered on rehearing, loc. cit. 23 So.2d 430, on May 2, 1945, in an action to rescind certain deeds on grounds of fraud, where the Court ruled:

"Was plaintiff required by law to tender or return the purchase price received before instituting annullment proceedings? It appears that the plaintiff did not tender or return the price received from Small for the lands and there has been production on Lot 74 by the Texas Company requiring an accounting, in the event the plaintiff is successful in this suit and the petitory actions. The Texas Company, in this case has also prayed, in the event the quitclaim deeds are set aside, that it be reimbursed the amount of the expenses incurred in drilling the well on the land covered by the second

quitclaim deed, citing Martel v. Hunt, 195 La. 701, 197 So. 402.

"In State v. Hackley, Hume & Joyce, 124 La. 854, 50 So. 772, 774, where the plaintiff sued to rescind the sale of lands on the ground of fraud but failed to tender or return the purchase price and the defendant pleaded a lack of tender, the court, on rehearing, said:

" 'The exception of want of tender was properly overruled. *Previous tender is not required in a suit to set aside a sale on the ground of fraud.* Germaine v. Mallerich, 31 La.Ann. 371; Heirs of Burney v. Ludeling, 41 La.Ann. 627, 6 So. 248; Killelea v. Barrett, 37 La.Ann. 865; [Heirs of] Self v. Taylor, 33 La. 769; Heirs of Wood v. Nicholls, 33 La.Ann. 744; Aronstein v. Irvine, 48 La.Ann. 301, 19 So. 131, *Especially where an accounting is alleged to be due.* 28 Ency.Pl. & Pr. 834.'

"In the case of Consolidated-Progressive Oil Corp. v. Standard Oil Co. of Louisiana, 158 La. 982, 105 So. 36, 38, an action was filed to set aside an assignment of a mineral lease for alleged fraud. There had been production on the property which would require an accounting, if the plaintiff prevailed. The defendant under its exception of no cause of action alleged that the plaintiff had failed to tender or return the price received as consideration. In disposing of this issue, the Court stated:

" 'The defendant, the Palmer Trust, urges under the exception of no cause of action that, as plaintiffs have failed to allege payment or tender of the price received, as a condition precedent to the maintenance of their action for the rescision of the assignment and the recovery of the oil produced, the petition in this case fails to set forth a cause of action.

" 'This contention is not sound, as previous tender is not required in a suit to set aside a sale on the ground of fraud, as in the present case. [Citing the above referred to authority.]' (Brackets ours.)" (Emphasis supplied.)

■ The decision just quoted from appears to be the last word on this subject by the highest Louisiana Court, notwithstanding earlier jurisprudence apparently to the contrary. As applied here, therefore, these plaintiffs are not required to tender back to defendant the amounts they received for their stock, especially since they pray for an accounting which, if granted, would entitle them to recover more than five times the price they were paid, less the amounts they received. Moreover, in keeping with the judicial philosophy enunciated in Certified Roofing, supra, we feel that plaintiffs should not be required to make a tender to defendant, because we know it would be refused—a vain and useless thing.

Accordingly, this part of defendant's motion must be, and is, denied.

■■ 3. Do plaintiffs have an adequate remedy at law? We think not.

If plaintiffs were to be relegated to an action in damages, they would find themselves, should they prevail, with a judgment against an empty shell—a corporation which had transferred all of its assets to its remaining shareholders, in keeping with its plan of liquidation and distribution, on or before September 26, 1956. Then, but only then,[2] could plaintiffs bring action against the individual stockholders who profited from the liquidation at plaintiffs' expense. As many as twenty-four separate suits, against each stockholder for his virile part, could or would be required. Each such defendant could, and undoubtedly would, insist upon being sued at his domicile. We are informed that some of them live outside Louisiana, as far away as New York City and Mineral Springs, Texas.

---

**2.** Christian v. Texas Gas & Power Corp., D.C.N.D.Tex.1952, 14 F.R.D. 80, quoted

from at some length in Paragraph 7 of these Rulings.

Moreover, if defendant transfers to the remaining stockholders pro rata the mineral interests it reserved in the sale of its timbered lands to Robert Gair Company, Inc., these stockholders in turn easily could put those interests partly or wholly beyond plaintiffs' reach by executing leases, and mineral or royalty sales to third persons. Likewise, by donations or otherwise, they could so divest themselves of any cash received from defendant, or confuse it with funds of third persons, so as to make it virtually impossible for plaintiffs to enforce any judgments they might obtain.

We are forced to conclude, therefore, that plaintiffs do not have an adequate legal remedy available to them in these circumstances.[3] Hence, this part of defendant's motion must be, and is, denied.

■ 4. Defendant's strange argument, that its position has so changed since it bought plaintiffs' stock that it could not comply with an order granting the relief sought, falls of its own weight.

It refers, of course, to its having already distributed, before this suit was filed, to its present shareholders the cash it had received in selling its lands, its mills and its railroad. No authorities are cited, none could be, in support of this point.

Factually, the record indicates that defendant probably could respond in full. Irrespective of that, however, it is a sufficient answer, we think, to state that plaintiffs clearly are entitled to seek recovery, to the limit of defendant's ability to respond, from such cash and other assets as it may have on hand when, and if, plaintiffs prevail on the merits of their case.

For these reasons, this part of defendant's motion must be, and is, denied.

■ 5. With respect to defendant's plea of laches, it is pertinent to view the practical aspects of the position in which plaintiffs allegedly found themselves. If they discovered, in July of 1955, that defendant had determined to liquidate

---

3. 28 Am.Jur.—Injunctions, Sec. 39, p. 236:
"* * * It is not enough that there is a remedy at law. But the remedy, to preclude injunction, must be certain and reasonably prompt, and as practicable and efficient to the ends of justice and its administration, both in respect of the final relief and the mode of obtaining it, as an injunction would be. The chief cause of the inadequacy of the remedies at law lies in the fact that the injury is irreparable or will occasion a multiplicity of suits."

Sec. 48, pp. 244–245:
"An injury will be regarded as irreparable so as to warrant injunctive relief where it tends toward the destruction of the complainant's estate, or where it is of such a character as to work the destruction of the property as it has been held and enjoyed, so that no judgment at law can restore it to him in that character. Very often an injury is irreparable where * * *
"* * * the damages occasioned are estimable only by conjecture, and not by an accurate standard." (Such as the value of the extensive mineral interests here involved.)

Sec. 49, pp. 245–246:
"Equity assumes jurisdiction to award relief by injunction where the injury complained of is otherwise irreparable and the

remedy at law inadequate. This want of a sufficient legal remedy and the resulting irremedial character of the injury proceed largely from the fact that he will be subjected to a great number of suits at law. Prevention of such multiplicity, always a sufficient ground of equity jurisdiction, furnishes a well-recognized basis for the assumption and exercise of the power to restrain acts injurious to property and civil rights, and to prevent a person from being subjected to the costs and vexation of innumerable suits at law. It is of itself, and without reference to other considerations, sufficient to uphold the remedy."

43 C.J.S., Injunctions, § 24, p. 449:
"Where the consummation of a wrongful act will injure complainant, and in order to obtain redress at law he would be required to bring many actions against many persons, he is entitled to an injunction to prevent the performance of the act, where the rights of all depend on the same questions both of law and fact.

"Also where the consummation of a wrongful or illegal act will probably result in many disputed claims and many actions at law against complainant, his remedy at law is inadequate and he is entitled to the protection of equity by injunction."

and distribute, still—according to the essential thrust of their case—they did not know then the true values of defendant's properties, and how much the remaining shareholders would derive from them.

While they then may have been deeply disappointed to learn that—contrary to what they had been told in 1953—defendant indeed would be liquidated, yet they did not realize then that they had been bilked into taking less than one-fifth of the actual value of their stock.

Their complete disillusionment came on, or shortly after, May 25, 1956—less than one month before this suit was filed on June 22, 1956—when they learned that the liquidation actually was returning nearly $10,000,000. Surely, if such circumstances truly were theirs, they are not guilty of laches, or any unreasonable delay in crossing swords with defendant.

At this time, we cannot tell with certainty, on the present record, whether plaintiffs actually were so totally ignorant of developments or actual values, as they allege. Because of this, we have concluded that this part of the motion must be, and is, denied; but its counterpart in defendant's answer (together with all other defenses) is to be preserved for determination with the merits of the case after we have heard the evidence on both sides of the controversy.

■■■ 6. In so far as defendant's motion attempts to exculpate the company from the alleged conduct of Johnson and McCullough, on the ground that they acted only for themselves and not for the corporation, we must look once again to the complaint, the allegations of which must be accepted as true for the purposes of this motion.

There it is expressly averred that these officers, in confecting and accomplishing their alleged scheme to defraud, were acting in their official capacities as President and Vice-President, respectively. Their knowledge and their action thereby became that of the corporation:

"* * * if a corporation (which ordinarily does not deal in its own stock) for its own lawful purposes sets out to buy shares through its managing officers, and they by intentional misrepresentation and concealment deceive a selling stockholder who is ignorant of the truth, though he be an inactive director who ought to know, so that he is damaged, we see no reason why the corporation is not bound for the consequences. The deceit practiced by the corporation's high officers in the corporation's business and for its benefit must be taken to be a corporate act, and not ultra vires. 19 C.J.S., Corporations, § 1278 a, b; 13 Am.Jur., Corporations, § 1125. * * *" Kohler v. Jacobs, 5 Cir., 1943, 138 F.2d 440, 442.

■■■ Moreover, the corporation ratified their action when it bought plaintiffs' stock for less than 18 per cent of its true value. It received the benefits. It cannot be heard to say now, if plaintiffs' charges are true, that Johnson and McCullough did not act for it.

For these reasons, this part of the motion must be, and is, denied.

■■■ 7. The present stockholders are not indispensable parties defendant. In law, if they had been joined, a plea of prematurity by them would be good.

Defendant is a Delaware corporation. As such, it, its stockholders, and persons claiming against it are subject to the corporation laws of that State. Christian v. Texas Gas & Power Corp., D.C.N.D. Tex.1952, 14 F.R.D. 80, 81. A footnote in that opinion quotes the Corporation Law of Delaware, Section 51, 8 Del.C. § 325, as follows:

"'No Suit against Director or Stockholder until Judgment against Corporation: No suit shall be brought against any officer, director or stockholder for any debt of a corporation, of which he is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied.'"

Naturally, the present shareholders' rights will be affected by the final outcome of this suit, either advantageously or adversely. But the same would be true in a suit brought, say, against American Telephone and Telegraph Company. No one would contend seriously that all of its multiple thousands of shareholders would be indispensable parties defendant in any suit brought by an outsider—plaintiffs are very much on the outside now—against that company. In the Christian case, supra, Judge Dooley passed upon a similar contention with this language:

"Obviously if the stockholders of the dissolved corporation are indispensable parties this Court cannot retain jurisdiction and the case would have to be dismissed. The question is controlled by the law of Delaware, as the stockholders in the dissolved corporation necessarily accepted their interest as such subject to the law of the corporate domicile. A statute of that State preserves the suability of a corporation for three years after dissolution and for that purpose, among others, the dissolution is in suspense for such time. This suit was field about six months after the dissolution of defendant. The corporation in question consequently was still subject to suit when this case was filed just the same as it would have been before the dissolution. It continued to be a corporate entity for the purpose of legal actions. The fact that these stockholders took over the assets of the dissolved company makes no difference in the rule. The present contention would not seriously be made if the defendant were still a going corporation. In fact the law of Delaware is clear on this subject. Since despite the aspect of dissolution a Delaware corporation still remains a live entity as defendant in a lawsuit no strong reason is pointed out to make the stockholders indispensable parties in this case. The courts have often held that stockholders of a corporation, though same has become dormant through insolvency, dissipation of assets or voluntary cessation of business, or has been even formally dissolved, are not necessary parties to somewhat similar suits against the corporation, as in their capacity as stockholders they are sufficiently represented by their corporation, so much so in fact that often they will be bound by a judgment against the corporation. *The primary right of the plaintiff in this suit is against the defendant corporation. Only a secondary liability could be maintained against the stockholders.* Their responsibility comes from their voluntary act in receiving and appropriating corporate property subject to a trust for the benefit of claimants against the corporation. A suit against the corporation alone should suffice at least for an adjudication of the fact and amount of any liability to this plaintiff, and if he recovers then his recourse against the stockholders may be dealt with under proper process of the law. * * *" (Emphasis supplied.)

As will be noted from the quotation, in that case the corporation had been dissolved, and its assets turned over to its shareholders, about six months before the suit was brought. Here defendant has not been dissolved. It is still a going concern, although now in the last stages of liquidation. Its shareholders are liable to plaintiffs, if at all, only secondarily. They not only are not indispensable parties; they would be improper parties if they had been joined.

This part of the motion, therefore, must be, and is, denied.

█ 8. As stated, the last point of defendant's motion is that there is a misjoinder of parties plaintiff.

We think the complete answer to that argument is found in Rule 20(a), Fed. Rules Civ.Proc. 28 U.S.C.A.:

"All persons may join in one action as plaintiffs if they assert any

right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action."

Analysis of plaintiffs' claims shows clearly that they seek recovery from the *same* defendant, whose officers allegedly acted in the *same* manner as to all plaintiffs, at roughly the *same* time, and with substantially the *same* results. All plaintiffs seek the *same* relief on the *same* grounds, i. e., 1) actual fraud, or 2) constructive fraud and unjust enrichment. All claims present *common* questions of fact and law. Their right to relief, if they establish it, arises out of the *same* series of transactions.

A multiplicity of suits, all aimed at the *same* goal and utilizing the *same* protective measures, would result if they could not join together in one assault upon their adversary.

We not only think plaintiffs properly have joined in their action here; it would have been improper for them to have proceeded separately.[4]

For these reasons, and those given above, this part of defendant's motion, and the entire motion, are denied.

This brings us at last to consideration of the whole case, as presented by the pleadings and supporting papers, with particular regard to whether a preliminary injunction properly should issue. That matter has been submitted on those documents, no testimony having been taken.

In passing, we must note for the record that, because of the many problems confronting us, as shown by the very length of this opinion, with time being of such importance, we have been forced to proceed to our preliminary determinations herein under much pressure. Frankly, we have not read all of the many authorities cited in the voluminous briefs, but we have studied carefully what we consider to be the controlling cases and texts, in an effort to grasp thoroughly the essentials involved. That we do not mention some of the authorities cited in the briefs does not mean we have not considered them. We simply do not have the time to discuss and distinguish them from those we do cite as apposite, according to our best judgment.

---

4. Black v. Simpson, 94 S.C. 312, 77 S.E. 1023, 1024, 46 L.R.A.,N.S., 137:
"For the purposes of this discussion, the material facts set out in the complaint may be stated in few words. The defendant, Arthur O. Simpson, was a director and general manager of the Farmers' Fertilizer Company in which the plaintiffs were shareholders. The defendant, while occupying this trust relation to the plaintiffs, conceived and entered upon a scheme of acquiring the entire corporate assets at much less than their actual value, by representing to each of the plaintiffs that the corporation was not prosperous, but financially embarrassed, and thus having assigned to him the shares of each of the plaintiffs at much less than their real value. The defendant successfully carried out his scheme by means of the false representations to the plaintiffs as to the condition of the corporation and the value of its property; and thus, in breach of his trust, induced the plaintiffs and other shareholders to sell him their stock. After thus acquiring all, or nearly all, the shares of stock, he sold 'the stock, franchises, real estate, buildings and machinery' at much more than he had paid the shareholders, to his great profit and to the great loss of the plaintiffs.

\* \* \* \* \*

"In a case like this where, according to the complaint, an officer of a corporation conceives and consummates a scheme to defraud the stockholders by deceiving them as to the value of the corporate property, and purchases the stock of each as a step in his scheme of fraudulent acquisition, *it seems to us not only illogical, but most inconvenient and unjust, to require each stockholder to allege and prove the fraudulent scheme and the breach of trust in a separate action.* In many corporations there are hundreds, and in some thousands, of stockholders, many of them having small holdings and residing at a distance from the corporate enterprise. *To establish a rule which would deny to stockholders in such cases the right to unite in attacking such a breach of trust as is here alleged and demanding an accounting by the trustee would be a practical denial of justice.*" (Emphasis supplied.)

It also should be clearly understood that, in ruling upon the case in its present posture, we are not expressing a final opinion on the merits. Necessarily, we must rule definitively upon the points now before us, but we emphasize that our findings at this stage of the matter are subject to revision, if facts not now before us require a change in our views as here expressed.

In our approach to this complicated matter, we have tried to maintain in proper balance, above the welter of facts, figures and prior decisions heaped upon us, the equities involved on both sides of the case. Inevitably, notwithstanding this plethora of legal and factual complexities, we find ourselves returning ultimately to the single, simple, inescapable fact: Plaintiffs received from defendant less than one-fifth of the actual value of their stock.

 Serious charges of deliberate fraud are made. Those charges are vehemently denied. Their resolution must await decision until all of the evidence is heard. Plaintiffs bear the heavy burden of proving actual fraud, not just by a preponderance of the evidence, but beyond a reasonable doubt.[5] Nonetheless, defendant admits in its answer that it began negotiations for sale of its timberlands—its most valuable asset—in April, 1954, only five months after it purchased the last of plaintiffs' stock. That could have occurred in all good faith, but at this point in the case it must be regarded as a circumstance rather strongly against defendant's position.[6] It is to actions, not just words, that we must look.

 The first offers to buy, for $300 per share, admittedly were made by defendant's officers, and it was they who ultimately concluded the transactions by presenting them to their Board for approval, readily granted. These officers stood in a fiduciary, or quasi-fiduciary, capacity in their relation to plaintiffs. It was their duty to advise plaintiffs fully, frankly and faithfully as to the true value of their stock.[7]

---

5. Belcher v. Booth, 1927, 164 La. 514, 114 So. 116.

6. We are informed in brief that defendant's President, in a discovery deposition taken on July 6, 1956, admitted that negotiations for sale of the timberlands began in January or February of 1954. However, since that deposition is not in the record, we do not consider it officially at this time.

7. Westwood v. Continental Can Co., Inc., 5 Cir., 80 F.2d 494, 498:

"We are satisfied that when directors or other officers step aside from the duty of managing the corporate business under the charter for the benefit of stockholders, and *enter upon schemes among themselves or with others to dispose of the corporate business and to reap a personal profit at the expense of the stockholders by buying up their shares without full disclosure and at an inadequate price, there is a breach of duty. If the corporation ought to cease business, the stockholders may so decide and take steps to share the assets. If a favorable opportunity arises to sell out, the stockholders and not the managing officers are entitled to have the benefit of it.*"

See also Markey v. Hibernia Homestead Association, La.App., 186 So. 757, 763:

"It is generally held that, while a fiduciary relationship in a strict sense does not exist as between the stockholder of a corporation and an officer or director thereof, there is at least a quasi fiduciary connection between the parties, particularly where it is the duty of the director, by reason of special circumstances, to disclose matters within his knowledge. In 13 American Jurisprudence, Section 1011, it is stated:

" 'A director or officer of a corporation actively engaged in the management of its affairs is, of course, in duty bound not actually to misrepresent the financial or other status of the corporate affairs. And if he does so, it has been held in various cases that the stockholder may rescind the sale or recover damages. *A sound and equitable rule has been taken that while a director or officer may not be a strict fiduciary for an individual stockholder from whom he purchases stock, yet if called upon for information concerning the affairs of the company or if he volunteers such information or becomes active in inducing the sale, he must speak fully and frankly and conceal nothing to the dis-*

We find it hard to believe now, although our mind is open and we reserve final judgment, that plaintiffs knew much about the value of the stock, for

*advantage of the selling stockholder.* Relief will be granted also to the stockholder where the purchasing director conspires to reduce the market price of the stock.'

"See, also, Fletcher's Cyclopedia of the Law of Corporations, vol. 3, sections 838 and 848. * * *

"It is to be observed here that the defendant directors were not purchasing plaintiff's stock with their own funds. On the contrary, they were using the assets of the corporation for that purpose. It seems too plain for extended argument that, under such circumstances, they became trustees for all of the stockholders and that, if they concealed in bad faith any facts from any one of the persons affected by the plan they devised, they should be made to respond for their deceit.

"In Wood v. MacLean Drug Co., 266 Ill.App. 5, it was held that a purchase of a block of its common stock by a family-owned chain drug corporation is subject to rescission, in a suit by a stockholder from whom purchased, after a sale of the company's stores to another company for an amount much larger per share of common stock than that paid to the individual stockholder, where it was not disclosed to such stockholder at the time of the purchase from her that two of the directors of her company, who were president and vice-president respectively, were negotiating with other companies for the sale of the company's stores, and such fact did not appear of record. There, the court, in distinguishing between the relation of a director who is purchasing the corporate stock for his own account from an individual stockholder, and the fiduciary capacity in which he acts where he is endeavoring to purchase stock for the corporation itself, stated:

" 'In the instant case, when the board of directors of the MacLean Drug Company, acting as such board, bought Mrs. Wood's stock, not for the individual directors personally but for the MacLean Drug Company, a corporation, they were acting in their official capacities as directors, and under the law as stated in the Hooker case, (See [Hooker v. Midland Steel Co.] 215 Ill. 444, 74 N.E. 445, 106 Am.St.Rep. 170) we think they were acting as trustees for Mrs. Wood and were in duty bound to advise her of all of the facts; not having done so, she is entitled to recover the balance of the value of her 500 shares.'

"The defendants also maintain that the conclusions drawn by plaintiff, with respect to the fraud which was allegedly perpetrated by them, are unwarranted because the correspondence which forms the basis of plaintiff's claim does not show that they misrepresented the facts. But fraud and deceit need not necessarily be founded upon misrepresentation. *On the contrary, a failure to state facts, where there is a duty to fully disclose them, is equally wrongful.*" (Emphasis supplied.)

See also Seagrave Corp. v. Mount, 6 Cir., 212 F.2d 389, loc. cit. 396, 397:

"We are of the opinion, however, that the case is controlled by the fundamental principle of equity governing the personal transactions of fiduciaries in matters involving the interests of those to whom the fiduciary duty runs. As expressed by then Chief Justice Cardozo of the Court of Appeals of New York in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1: 'Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honest*ly* alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions.'

"*A director is a fiduciary. So is a dominant or controlling stockholder or group of stockholders.* Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Southern Pacific Co. v. Bogert, 250 U.S. 483, 491–492, 39 S.Ct. 533, 63 L.Ed. 1099; Wagner Electric Corp. v. Hydraulic Brake Co., 269 Mich. 560, 566, 257 N.W. 884. *When the dual relationship of individual and fiduciary creates a conflict of interest the fiduciary relationship must prevail.* The Supreme Court said in United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, at pages 263–264, 37 S.Ct. 509, at page 510, 61 L.Ed. 1119, that questions of internal management are ordinarily left to the discretion of the directors, and 'Courts interfere seldom to control such discretion intra vires the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or *where they stand in a*

otherwise they surely would not have sold it for such a small fraction of its real worth. While the value may have changed substantially since 1953,[8] defendant's officers then must have known, approximately at least, the true worth of the corporate assets, and consequently, the true value of its shares, either as a going concern or in liquidation. In any event, deliberate fraud aside, there is enough shown dehors that question, we think, to justify us in preserving the *status quo* until trial on the merits has been had.

We refer to plaintiffs' alternative grounds for relief. Can it conscientiously be said that the consideration they got was serious, as required by Louisiana law, or that the transactions did not constitute an unjust enrichment to defendant? We shall answer those questions after first referring to the applicable Louisiana authorities, and others which are pertinent.

Article 2464 of the LSA–Civil Code of Louisiana reads:

"The price of the sale must be certain, that is to say, fixed and determined by the parties.

"It ought to consist of a sum of money, otherwise it would be considered as an exchange.

"It ought to be serious, that is to say, there should have been a serious and true agreement that it should be paid.

"*It ought not to be out of all proportion with the value of the thing; for instance the sale of a plantation for a dollar could not be considered as a fair sale; it would be considered as a donation disguised.*" (Emphasis supplied.)

In Murray v. Barnhart, 1906, 117 La. 1023, 42 So. 489, 491, the Court said:

"* * * At common law 'the slightest consideration is sufficient to support the most onerous obligation. The inadequacy, as has been said, is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced.' 9 Cyc. 365; A. & E. E. vol. 6, p. 694. *But under our law the consideration 'must be serious': 'it must not be out of all proportion with the value of the thing.'* Article 2464, Civ.Code. That article has special reference to the price of a sale, but the principle it involves is not peculiar to sales. It is a general principle of

dual relation which prevents an unprejudiced exercise of judgment; * * *.' (Emphasis added.) This was repeated with approval by this Court in United Milk Products Corp. v. Lovell, supra, 6 Cir., 75 F.2d 923, 927. In Ashman v. Miller, supra, 6 Cir., 101 F.2d 85, 91, we again said: 'It is too plain for citation of authority that a director of a corporation cannot barter or sell his official discretion or enter into any contract whatever that will in any way restrict or limit the free exercise of his judgment and discretion in his official capacity, nor can he place himself under any direct and powerful inducement to disregard his duty to the corporation and its stockholders in the management of corporate affairs.' See also: Thomas v. Matthews, 94 Ohio St. 32, 43, 60, 113 N.E. 669, L.R.A.1917A, 1068.

\* \* \* \* \*

"Although good faith on the part of the Directors and the disclosure of the material facts eliminate the question of

actual fraud, *equity will still act to enforce the fiduciary obligation under circumstances amounting to constructive fraud.* Constructive fraud refers to acts which may have been done in good faith, with no purpose to harm the corporation, but which are done by one who has placed himself in a position of conflict between a fiduciary obligation and his own private interests. In such a situation, by reason of the strict rule applicable to fiduciaries, equity will take appropriate action to prevent the harm resulting from such actions, regardless of the good intentions of the fiduciary. Levitan v. Stout, D.C.W.D.Ky., 97 F.Supp. 105, 117; Epstein v. United States, 6 Cir., 174 F.2d 754, 765–766; Hyams v. Calumet & Hecla Mining Co., 6 Cir., 221 F. 529, 542–543." (Emphasis supplied.)

8. The value at the time of the sale, not now, is the figure that controls. Haas v. Cerami, 201 La. 612, 10 So.2d 61; Ronaldson & Puckett Co. v. Bynum, 122 La. 687, 48 So. 152.

the civil law, and as old as the civil law itself. The example given by Ulpien as an illustration of it is not that of a sale, but, as happens, is that of a lease:

" 'Si quis conduxerit nummo uno, locatio nulla est; quira hoc donationis instar obtinet.' L. 46 Dig. f. f. Loc.Cond.; Pothier, Vente, Nos. 18 and 19; Merlin, Rep.Vo.Vente, § 1, art. 2, No. 1; Durantor, T. 16, No. 100; Troplong, Vente, No. 149; Marcade on articles 1591 and 1592, C.N.

"In such a case the presumption is that the parties did not intend that the *trifle* named should ever be paid at all, and the situation is looked upon as being as if no amount had been named. * * *" (Emphasis supplied.)

Later, in 1928, the same Court, in Blanchard v. Haber, 166 La. 1014, 118 So. 117, 119, said:

"Under the civil law, as at common law, it is not necessary that the consideration received or to be received for incurring an obligation shall be an equivalent consideration. The question of adequacy of the consideration is a matter for the parties themselves to determine. But, while at common law any lawful consideration for a contract is deemed sufficient, the civil law requires that the *consideration must be serious and not altogether out of proportion to the obligation. Article 2464 of the Civil Code so provides, specifically, for the contract of sale; and in Murray v. Barnhart, 117 La. 1030, 42 So. 489, it was held that the doctrine of the civil law in that respect, being as old as the civil law itself, was applicable, not only to contracts of sale, but to all other contracts."* (Emphasis supplied.)

To the same effect are Hirsch v. Rosenberg, La.App., 14 So.2d 331; Shreveport Laundries v. Teagle, La.App., 139 So. 563; Spanier v. DeVoe, 52 La.Ann. 581, 27 So. 174, and D'Orgenoy v. Droz, 13 La. 382. See also Cali v. National Linen Service Corp., 5 Cir., 38 F.2d 35.

 Pomeroy's Equity Jurisprudence, Vol. 3, Section 927, pp. 634–638, states:

"Although the actual cases in which a contract or conveyance has been canceled on account of gross inadequacy merely, without other inequitable incidents, are very few, yet the doctrine is settled, by a consensus of decisions and dicta, that even in the absence of all other circumstances, when the inadequacy of price is so gross that it shocks the conscience, and furnishes satisfactory and decisive evidence of fraud, it will be a sufficient ground for canceling a conveyance or contract, whether executed or executory. Even then fraud, and not inadequacy of price, is the true and only cause for the interposition of equity and the granting of relief.

\* \* \* \* \* \*

"The following seems to be the true rationale of the doctrines concerning inadequacy of price: Whenever it appears that the parties have knowingly and deliberately fixed upon any price, however great or however small, there is no occasion or reason for interference by courts, for owners have a right to sell property for what they please, and buyers have a right to pay what they please. But where there is no evidence of such knowledge, intention, or deliberation by the parties, the disproportion between the value of the subject-matter and the price may be so great as to warrant the court in inferring therefrom the fact of fraud. Such a gross inadequacy or disproportion will call for explanation, and will shift the burden of proof upon the party seeking to enforce the contract, and will require him to show affirmatively that the price was the result of a deliberate and intentional action by the parties; and if the facts do prove such action, the

fact of fraud will be more readily and clearly inferred."

Applying these authorities to the admitted facts of this case, it is our opinion that the price paid by defendant for plaintiffs' stock was so trifling, so inordinately out of proportion to its true value, that no fair-minded person could say it was "serious". Its inadequacy "shocks the conscience".

Article 1965 of the LSA–Civil Code of Louisiana, provides:

"The equity intended by this rule is founded in the Christian principle not to do unto others that which we would not wish others should do unto us; and on the moral maxim of the law that *no one ought to enrich himself at the expense of another.* When the law of the land, and that which the parties have made for themselves by their contract, are silent, courts must apply these principles to determine what ought to be incidents to a contract, which are required by equity." (Emphasis supplied.)

Restatement of the Law, on the subject of "Restitution", page 12, states:

"A person who has been unjustly enriched at the expense of another is required to make restitution to the other."

Herrmann v. Gleason, 6 Cir., 126 F.2d 936, 940, held:

" * * * It is said that the action is equitable to the degree that it is based on a moral obligation to make restitution which rests upon a person who has received a benefit which, if retained by him, would result in inequity and injustice. Hummel v. Hummel, 133 Ohio St. 520, 14 N.E.2d 923. Under the doctrine of unjust enrichment, a defendant has something of value at the plaintiff's expense under circumstances which impose a legal duty of restitution. American University v. Forbes, 88 N.H. 17, 183 A. 860. See Wilson Cypress Co. v. Atlantic Coast Line R. Co., 5 Cir., 109 F.2d 623; Ames' Lectures on Legal History, pages 149–166; Holdsworth's History of English Law, Vol. 8, page 92 et seq.; Lawrence on Equity Jurisprudence, § 738."

On the basis of those authorities, it is also our opinion that defendant was unjustly enriched through its purchase of plaintiffs' stock, and ought to make restitution.

It may be that plaintiffs, and especially Mrs. Johnson, Mrs. Jennette, and Max Brown, by their knowledge of the facts and their subsequent actions, have knowingly ratified defendant's conduct so as to be estopped from prevailing in their claims. Nevertheless, we think they are entitled to their day in court to prove, if they can, their right to recover. Such serious matters ought not to be decided merely on the face of the papers.

The problem which has caused us our greatest concern, in determining whether a preliminary injunction should issue, is the large potential tax consequence with respect to defendant's liquidation. Naturally, that is a result which all parties, and the Court, wish to avoid.

We are informed by all counsel, however, that a conference was held at Washington, D. C., on August 2, 1956, between plaintiffs' and defendant's counsel, on the one hand, and an official of the United States Department of Internal Revenue, on the other, wherein the latter informally stated that the tax loss probably could be avoided if defendant's remaining assets are transferred to a Court-designated trustee, as stake-holder, with power to invest in short-term Government securities. We think application for a formal ruling to that effect by all means should be made at once, and when received, the transfer should be made.

We thus conclude that plaintiffs are entitled to a trial. To protect their rights pending final determination, they likewise are entitled to have all assets remaining in defendant's hands, or subject to equitable control and distribution by this Court (including payments received and to be received, upon the bal-

ance of the purchase price for the timberlands, from the Gair Company), preserved for their benefit, should they succeed on the merits.

For these reasons, therefore, the preliminary injunction will be granted. Its terms, and the amount of bond to be furnished by plaintiffs, will be fixed after due hearing, to be arranged shortly. The case will be set for trial on its merits at the earliest possible date.